UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

In re:                                          Chapter 11

E. 9TH STREET HOLDINGS LLC,                      Case No.: 17-23141-rdd

                            Debtor.

-----------------------------------------------------------X


PLAN OF LIQUIDATION OF E. 9TH STREET HOLDINGS LLC




**ROBINSON BROG LEINWAND
GREENE GENOVESE & GLUCK P.C.**
**Attorneys for the Debtor**
875 Third Avenue, 9th Floor
New York, New York 10022
Tel. No.: 212-603-6300

**A. Mitchell Greene, Esq.**


**Dated:** New York, New York
           November 15, 2017

E. 9th Street Holdings LLC, the debtor and debtor in possession (the "**Debtor**"), proposes the following plan of liquidation pursuant to sections 1121(a), 1122 and 1123 of title 11 of the United States Code.

## ARTICLE 1

### DEFINITIONS

Unless the context otherwise requires (i) the following terms shall have the following meanings when used in this Plan; (ii) any capitalized term that is used in this Plan and not defined in this Article 1 but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning set forth therein; (iii) terms stated in the singular shall include the plural and vice versa; (iv) pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter; (v) all section, article and exhibit references in the Plan are to the respective section of, article of or exhibit to the Plan; (vi) any reference to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions, means that such document shall be substantially in such form or substantially on such terms and conditions except as stated otherwise in the Plan; (vii) any reference to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented; (viii) the words "herein", "hereof", "hereto" or "hereunder" and other words of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan; (ix) the rules of construction set forth in section 102 of the Bankruptcy Code shall govern construction of the Plan; and (x) any reference contained herein to the Bankruptcy Code, or to any section of the Bankruptcy Code, refers to the Bankruptcy Code, or such section of the Bankruptcy Code, as it is existing and

effective on the Petition Date, except to the extent, if any, that any post-Petition Date amendment to the Bankruptcy Code applies retroactively to cases filed on the Petition Date.

1.1 **"Administrative Bar Date"** means the first Business Day that is 30 days after the Effective Date.

1.2 **"Administrative Claim"** means a Claim for, or request for payment of, an Administrative Expense (i) as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or (ii) as to which any objection has been resolved by a Final Order allowing such claim in whole or in part, to the extent such claim is Allowed.

1.3 **"Administrative Expense"** means any cost or expense of administration of this Case, other than Bankruptcy Fees, allowable under sections 503(b), 330 or 331 of the Bankruptcy Code.

1.4 **"Administrative Tax Claim"** means an Administrative Claim for a tax due to a Governmental Unit.

1.5 **"Allowed Claim"** means a Claim or any portion thereof against the Debtor that has not been disallowed pursuant to a Final Order and is not a Disputed Claim and (i) with respect to which a Proof of Claim has been timely filed with the clerk of the Bankruptcy Court or, (ii) if no Proof of Claim has been filed, that has been or hereafter is listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent.

1.6 **"Allowed ... Claim"** means an Allowed Claim of the type described.

1.7 **"Allowed Interest"** means an Interest in the Debtor that has not been disallowed and is not a disputed Interest with respect to which (i) a Proof of Interest has been

timely filed or, (ii) if no Proof of Interest has been timely filed, that has been or hereafter is listed by the Debtor in the Schedules.

1.8 **"Available Cash"** means the sum of cash remaining in the Debtor's Estate.

1.9 **"Bankruptcy Code"** means title 11 of the United States Code, as amended from time to time and effective as to cases filed on the Petition Date.

1.10 **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York or the United States District Court for the Southern District of New York to the extent it withdraws the reference over all or any portion of this Chapter 11 Case pursuant to section 157(d) of title 28 of the United States Code.

1.11 **"Bankruptcy Fees"** means all fees and charges assessed against the Estate under section 1930 of title 28 of the United States Code.

1.12 **"Bankruptcy Rules"** means (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York, in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to this Chapter 11 Case.

1.13 **"Bar Date"** means October 10, 2017.

1.14 **"Business Day"** means any day other than a Saturday, Sunday, or other day on which commercial banks in New York, New York are authorized or required by law to close, or other Legal Holiday.

1.15    "**Case**" means the case under chapter 11 of the Bankruptcy Code commenced in the Bankruptcy Court on the Petition Date and styled *In re E. 9th Street Holdings LLC*, Case No. 17-23141-rdd.

1.16    "**Cash**" means, on any Business Day, immediately available funds, in United States dollars, which may be spent or transferred without restriction no later than the next Business Day.

1.17    "**Cash Collateral Order**" means the Stipulated Order Authorizing Debtor to Use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001 entered on September 9, 2017.

1.18    "**Claim**" means a "claim" against the Debtor or property of the Debtor, as defined in section 101(5) of the Bankruptcy Code.

1.19    "**Class**" means a category of substantially similar Allowed Claims or Allowed Interests as established pursuant to article 3 of the Plan.

1.20    "**Closing**" means the consummation of the sale of the Debtor's Property to the Purchaser pursuant to the Plan and Contract of Sale.

1.21    "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Case.

1.22    "**Confirmation Date**" means the date on which the Confirmation Order is entered by the Bankruptcy Court, provided that the Confirmation Order becomes a Final Order.

1.23    "**Confirmation Order**" means an Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, in form and substance reasonably satisfactory to the Debtor.

1.24    **"Contract of Sale"** means the contract of sale between the Debtor and Purchaser, or its assignee or nominee, and any amendments thereto, which is attached hereto as **Exhibit A**.

1.25    **"Creditor"** means a Holder of an Allowed Claim.

1.26    **"Cure Amount"** means any amount required, pursuant to sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code, to cure any defaults or compensate the non-debtor party to any Executory Contract or Unexpired Lease for any actual pecuniary loss resulting from a default in respect of an Executory Contract or Unexpired Lease.

1.27    **"Debtor"** means E. 9th Street Holdings LLC, with a mailing address at c/o GC Realty Advisors LLC, 7280 West Palmetto Park Road, Suite 203-N, Boca Raton, Florida 33433.

1.28    **"Disbursing Agent"** means Robinson Brog Leinwand Greene Genovese & Gluck P.C.

1.29    **"Disclosure Statement"** means the *Disclosure Statement for the Plan of Liquidation of E. 9th Street Holdings LLC,* including all exhibits, attachments or amendments thereto, approved by Final Order of the Bankruptcy Court.

1.30    **"Disputed Claim"** means

(a) any Claim that is listed in the Schedules as disputed, contingent or unliquidated and with respect to which no Proof of Claim has been filed;

(b) any Claim (including an Administrative Expense Claim), or portion thereof, that has not been disallowed and with respect to which an objection to the allowance thereof, in whole or in part, or the estimation of such Claim, has been filed with the Bankruptcy Court within the applicable period of limitation fixed by the Plan, the Bankruptcy

Code, the Bankruptcy Rules or the Bankruptcy Court, to the extent that any such objection has not been resolved by a Final Order; or

(c)     Until the earlier of (i) the filing of an objection to a Proof of Claim or (ii) the last date to file objections to Claims as established by the Plan or by Final Order, a Claim represented by a Proof of Claim shall be deemed to be a Disputed Claim in its entirety if, (x) the amount specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules; (y) any corresponding Claim listed in the Schedules has been scheduled as disputed, contingent or unliquidated; or (z) no corresponding Claim has been listed in the Schedules.

1.31     **"Disputed Claim Reserve"** means the segregated account or accounts established by the Disbursing Agent pursuant to section 7.7 of the Plan.

1.32     **"E Village Lender"** means E Village Lender LLC, the holder of the E Village Lender Note, E Village Lender Secured Claim, and E Village Lender Documents, as defined herein.

1.33     **"E Village Lender Note"** means collectively, each and every agreement, promissory note, including that certain Mortgage Note dated August 25, 2016 in the principal amount of $5,750,000.00 and any amendment or modification thereof, or allonge thereto, evidencing a claim held by E Village Lender.

1.34     **"E Village Lender Secured Claim"** means the Secured Claim against the Debtor, or the Property, on account of the E Village Lender Note or the E Village Lender Security Documents Allowed in the undisputed amount of $6,145,412.40 as of November 14, 2017 as set forth in the breakdown attached hereto as Exhibit B which amount includes legal fees due through September 30, 2017. The E Village Lender Secured Claim will continue to accrue interest at the default rate equivalent to $1,324.60 per diem, legal fees and other charges due

under the E Village Lender Note from November 15, 2017 through payoff at the Closing of the sale of the Property. However, subject to the Closing taking place on or before March 1, 2018, E Village lender's legal charges will be capped at $49,000. The E Village Lender Secured Claim shall be an Allowed Claim pursuant to the terms of the Plan and not subject to any claim, defense, offset, setoff or recoupment of the Debtor or Liquidating Debtor under this Plan, subject only to Debtor's right to object to: (1) legal charges that accrue from October 1 to the Closing to the extent the Closing does not take place on or before March 1, 2018; and (2) other charges due under the E Village Lender Note that accrue from October 10, 2017 to the Closing.

1.35    "**E Village Lender Security Documents**" means each and every mortgage, assignment of rents, security agreements, and/or any such other documents granting E Village Lender a lien on the Property to secure the E Village Lender Note including without limitation that certain Mortgage dated August 25, 2016 in the principal amount of $5,750,000.00.

1.36    "**Effective Date**" means the first Business Day after which all of the conditions to the Effective Date, specified in Section 11.1 of this Plan have been satisfied.

1.37    "**Estate**" means the Estate of the Debtor created on the Petition Date pursuant to section 541 of the Bankruptcy Code.

1.38    "**Executory Contract**" means an executory contract within the meaning of section 365 of the Bankruptcy Code.

1.39    "**Final Order**" means a judgment, order, ruling or other decree of the Bankruptcy Court (or court of competent jurisdiction) entered by the Clerk on the docket of the Chapter 11 Case (or on the docket of any court of competent jurisdiction) that has not been reversed, vacated or stayed and as to which (i) the time to appeal, petition for *certiorari* proceeding or move for a new trial, reargument or rehearing has expired and as to which no

appeal, petition for *certiorari* proceeding, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Bankruptcy Rule 9023 or Bankruptcy Rule 9024, or any analogous rule under the Bankruptcy Rules (or rule of a court of competent jurisdiction), may be filed relating to such order shall not cause such order not to be a Final Order.

1.40    **"Holder"** means a Person holding a Claim or Interest.

1.41    **"Interest"** means an equity interest in the Debtor.

1.42    **"Interest Holder"** means the Holder of an Allowed Interest in the Debtor.

1.43    **"Leases"** means any Unexpired Lease of real property between the Debtor and its Tenants, if any.

1.44    **"Legal Holiday"** means a "Legal Holiday" as that term is defined in Bankruptcy Rule 9006(a).

1.45    **"Lien"** means any charge against or interest in property to secure payment of a debt or performance of an obligation.

1.46    **"Liquidating Debtor"** mean the Debtor after the Effective Date.

1.47    **"Other Secured Claims"** means any other Secured Claim against the Property that is not the E Village Lender Claim.

1.48    **"Order"** means an order of the Bankruptcy Court.

1.49    **"Person"** means a person as defined in 11 U.S.C. § 101(41).

1.50    **"Petition Date"** means July 21, 2017, the date on which this Case was commenced by the filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code by the Debtor.

1.51    **"Plan"** means this *Plan of Liquidation of E. 9th St. Holdings LLC,* as it may be amended, supplemented or modified from time to time, including any exhibits or schedules annexed hereto or required to be filed with the Bankruptcy Court pursuant hereto.

1.52    **"Plan Supplement"** means a separate document to be filed with the Bankruptcy Court as a supplement to this Plan no later than five (5) days prior to the Confirmation Date that shall contain the documents necessary to administer this Plan, if necessary.

1.53    **"Priority Non-Tax Claim"** means that portion of an Allowed Claim, other than a Priority Tax Claim, an Administrative Tax Expense Claim, a Secured Claim, or Bankruptcy Fees, entitled to priority in payment under Bankruptcy Code Section 507(a) or (b).

1.54    **"Priority Tax Claim"** means an Allowed Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

1.55    **"Professional"** means all professionals employed by the Debtor under sections 105, 327 or 330 of the Bankruptcy Code to render professional services in the Chapter 11 Case pursuant to a Final Order.

1.56    **"Professional Fees"** means compensation for services rendered, and reimbursement of expenses incurred, by Professionals prior to the Closing, as allowed and

awarded by Final Order following application, in accordance with sections 330 and 331 of the Bankruptcy Code.

1.57 **"Proof of Claim"** means a proof of Claim filed pursuant to section 501 of the Bankruptcy Code and Part III of the Bankruptcy Rules.

1.58 **"Proof of Interest"** means a proof of an Interest filed pursuant to section 501 of the Bankruptcy Code and Part III of the Bankruptcy Rules.

1.59 **"Property"** means the real property and improvements thereon located at 332 East 9th Street, New York, New York.

1.60 **"Pro Rata"** means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Interests in such Class.

1.61 **"Purchaser"** means 332 East 9th LLC or its assignee or nominee.

1.62 **"Sales Proceeds"** means the proceeds paid on account of the sale of the Property pursuant to the Contract of Sale.

1.63 **"Schedules"** mean the schedules of assets and liabilities, any amendments with respect thereto, and the *Statement of Financial Affairs* filed by the Debtor with the Bankruptcy Court in accordance with section 521(1) of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules and any amendments thereto.

1.64 **"Secured Claim"** means an Allowed Claim, including all amounts, if any, allowed pursuant to section 506(b) of the Bankruptcy Code, to the extent that it is secured by a Lien on Property in which the Estate has an interest or that is subject to set-off under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Estate's interest in such Property or to the extent of the amount subject to set-off, as applicable, as

determined by a Final Order pursuant to section 506(a) of the Bankruptcy Code or as provided for in the Plan.

1.65    **"Secured Creditor"** means the Holder of a Secured Claim.

1.66    **"Tenants"** means all non-Debtor parties to Leases with the Debtor for residential or commercial space at the Property.

1.67    **"Transfer Taxes"** means any and all stamp taxes or similar taxes, if and as applicable and imposed by a Governmental Unit with respect to the transfer of a property or interest therein.

1.68    **"Unsecured Claim"** means a Claim against the Debtor that is not an Administrative Claim, an Administrative Tax Claim, a Bankruptcy Fee, a Priority Tax Claim, a Priority Non-Tax Claim, or a Secured Claim.

1.69    **"Unsecured Creditor"** means the Holder of an Unsecured Claim.

1.70    **"Unexpired Lease"** means an unexpired lease within the meaning of section 365 of the Bankruptcy Code.

## ARTICLE 2

### TREATMENT OF UNCLASSIFIED CLAIMS

Pursuant to section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims or Allowed Priority Tax Claims. Such Claims, to the extent Allowed, shall receive the treatment provided in this article 2 in full satisfaction, release and discharge thereof.

2.1    **Administrative Bar Date**. Except as otherwise provided in sections 2.2, 2.3 and 2.4 of the Plan, requests for payment of Administrative Expenses must be filed no later than the Administrative Bar Date. Holders of Claims for payment of Administrative Expenses that do not file requests for the payment of Administrative Expenses on or before the Administrative Bar Date shall

be forever barred from asserting such Claims against the Debtor or its Property. The Administrative Bar Date, as defined in Article 1.1 means the first Business Day that is 30 days after the Effective Date.

2.2 **Professional Compensation and Reimbursement**. Each Person seeking an award by the Bankruptcy Court of Professional Fees shall file its final application for approval of its Professional Fees no later than 30 days after the Administrative Bar Date. Each Holder of an Allowed Claim for Professional Fees shall receive from the Disbursing Agent, in full satisfaction of such Allowed Claim, Cash in the amount of such Allowed Claim within three days of the entry of a Final Order Allowing such Claim.

2.3 **Administrative Claims**. Subject to the provisions of article 7 of the Plan with respect to Disputed Claims, each Administrative Claim, to the extent not previously paid, shall be paid by the Disbursing Agent in Cash in full on (i) the later of (x) 30 days after the Closing, (y) the date payment of such Claim is due under the terms thereof or applicable law, or (z) three business days after such Claim becomes an Allowed Administrative Claim or (ii) as may be otherwise mutually agreed in writing between the Debtor and the Holder of such Claim; *provided, however,* that any Administrative Claim incurred by the Debtor in the ordinary course of its business shall be paid in full or performed by the Liquidating Debtor in accordance with the terms and conditions of the  particular transaction giving rise to such Administrative Claim and any agreements relating thereto.

2.4 **Administrative Tax Claims.** Subject to the provisions of Article 7 of the Plan with respect to Disputed Claims, all allowed Administrative Tax Claims held by Governmental Units shall be paid, in Cash, in full either (i) on or prior to the Closing, or (ii) upon such other terms

as may be agreed to, in writing, between the Debtor and such Governmental Units on or before the Confirmation Date.

      2.5    **Priority Tax Claims.**  In full satisfaction, release and discharge of Priority Tax Claims, and except as may be otherwise mutually agreed in writing between the Debtor and such Governmental Units, all allowed Priority Tax Claims shall be paid by the Liquidating Debtor in Cash in full, together with interest within 30 days of the Closing.

      2.6    **Bankruptcy Fees.**  All fees and charges assessed against the Debtor under section 1930 of title 28 of the United States Code and any applicable interest thereon shall be paid by the Debtor, in full, in Cash as and when due, until the closing, conversion or dismissal of this Case, whichever is earlier.

## ARTICLE 3

### CLASSIFICATION OF CLAIMS AND INTERESTS

Except as otherwise provided in article 2, Allowed Claims and Allowed Interests are classified as set forth in this article 3. A Claim or Interest is in a particular Class designated herein only to the extent such Claim or Interest (i) fits within the description of such Class and is in such other and different Class or Classes to the extent that the remainder thereof fits within the description of such other Class or Classes and (ii) has not been paid, released or otherwise satisfied within 30 days of the Closing.

      **Class 1 – Priority Non-Tax Claims.** Class 1 consists of all Priority Non-Tax Claims.

      **Class 2 –E Village Lender Secured Claim**. Class 2 consists of the Allowed E Village Lender Secured Claim.

      **Class 3 – Other Secured Claims.** Class 3 consists of all Other Allowed Secured Claims.

**Class 4 – Unsecured Claims.**  Class 4 consists of all Allowed Unsecured Claims.

**Class 5 – Interests.**  Class 5 consists of all Interests in the Debtor.

<h2 style="text-align:center">ARTICLE 4</h2>

<h3 style="text-align:center">TREATMENT OF CLAIMS AND INTERESTS</h3>

Allowed Claims in Classes 1-4 and the Interests in Class 5 are unimpaired, are not entitled to vote on the Plan, and are deemed to have accepted the Plan.  The members of each Class shall receive the following treatment under the Plan in full satisfaction, release and discharge thereof.

4.1    **Class 1 – Priority Non-Tax Claims.**  In full satisfaction, release and discharge of the Priority Non-Tax Claims, each Holder of a Priority Non-Tax Claim shall receive, within 30 days of the Closing, or as soon as practicable after each such Claim becomes an Allowed Claim, whichever is sooner, payment from the Disbursing Agent, (i) in Cash in the full amount of its Priority Non-Tax Claim, or (ii) as may be otherwise agreed in writing between the Debtor and the Holder of such Priority Non-Tax Claim.

4.2    **Class 2 – E Village Lender Secured Claim.**  Subject to the provisions of Article 7 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of the E Village Lender Secured Claim, E Village Lender shall receive Cash at Closing from the Sales Proceeds in the amount of the Allowed E Village Lender Secured Claim.

4.4    **Class 3 – Other Secured Claims.**  Subject to the provisions of Article 7 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of each Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive at the Closing, or as soon as practicable after each such Other Secured Claim becomes an Allowed Claim, (i) Cash, in the full amount of its Claim, or (ii) such other treatment as to which the Debtor and each Holder of such Other Secured Claim shall have agreed upon in writing.

4.5     **Class 4 – Unsecured Claims.**  Subject to the provisions of Article 7 of the Plan with respect to Disputed Claims, in full satisfaction, settlement, release and discharge of the Class 4 Unsecured Claims, the Holders of the Class 4 Unsecured Claims against the Debtor shall receive, within 30 days of the Closing, Cash equal to 100% of their Allowed Claim, with interest at the federal judgment rate, from the Disbursing Agent.

4.6     **Class 5 - Interests**.  After all payments are made under the Plan, any remaining Cash, including any Sales Proceeds, shall be distributed to the Holders of Allowed Interests.

## ARTICLE 5

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1     **Assumption and Assignments of Executory Contracts and Unexpired Leases.**  At the Closing, all Executory Contracts and Unexpired Leases, which are identified in the Contract of Sale, to which Debtor is a party, if any, shall be deemed assumed and assigned to the Purchaser in accordance with Section 365 of the Bankruptcy Code.

5.2     **Assumption Cure Payments**.  Except as otherwise agreed to by the parties, at the Closing, the Liquidating Debtor shall cure any and all undisputed defaults under any Executory Contract or Unexpired Lease that is assumed pursuant to the Plan in accordance with Section 365 of the Bankruptcy Code. Unless the parties to the contract or lease agree otherwise, all disputed defaults that are required to be cured shall be cured by the later to occur of (i) ten (10) days after the entry of a Final Order determining the amount, if any, of the Liquidating Debtor's liability with respect thereto and (ii) the Closing.

5.3     **Rejection Claims.**  Allowed Claims arising from the rejection of any Executory Contract or Unexpired Lease of the Debtor shall be treated as an Unsecured Claim.

5.4     **Bar to Rejection Claims.** A Proof of Claim with respect to any Unsecured Claim for damages arising from the rejection of an Executory Contract or Unexpired Leases pursuant to the Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Debtor no later than 30 days after the later of (i) the date of entry of a Final Order approving such rejection (unless such Final Order expressly provides a Bar Date with respect to such Claim, in which event no Proof of Claim with respect to such Claim shall be deemed timely filed unless it is filed with the Bankruptcy Court and served in the manner provided in such Final Order), or (ii) the Closing. Any such Proof of Claim not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtor, its successors or their respective properties.

## ARTICLE 6

### IMPLEMENTATION OF THE PLAN

6.1     **Implementation.** The Debtor shall take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan. The Confirmation Order shall contain appropriate provisions, consistent with section 1142 of the Bankruptcy Code, directing the Debtor and any other necessary party to perform any act, including the satisfaction of any lien that is necessary for the consummation of the Plan. Additionally the Confirmation Order shall contain provisions approving the Contract of Sale pursuant to section 363 of the Bankruptcy Code as well as approving the sale of the Property as a private sale and shall further provide for the payment of the Allowed E Village Lender Secured Claim at Closing of the sale of the Property.

6.2     **Sale of Assets.** In order to fund distributions under the Plan, the Debtor shall consummate the Closing and sale of the Property to Purchaser pursuant to Bankruptcy Code section 363 and 1123(a)(5)(D), free and clear of any and all liens, claims, encumbrances, interests, bills or charges whatsoever, other than the usual and customary utility easements, if any, appearing as of

record or as preserved under this Plan, with the E Village Lender Secured Claim and all Other Secured Creditors' liens to attach to the proceeds of sale in the order of their priority. The Allowed E Village Lender Secured Claim and all Allowed Other Secured Claims shall be paid from the Sales Proceeds at Closing.

6.3 **Plan Funding**. The Plan shall be funded by the Sales Proceeds, the Debtor's Available Cash on the Closing, including all amounts available in the Debtor's debtor in possession bank account. These funds shall be utilized to satisfy payments due consistent with the terms of this Plan.

6.4 **Transfer Taxes.** Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer in connection with or in furtherance of the Plan, (including any instrument executed in furtherance of the transactions contemplated by the Plan), shall not be subject to tax under any law imposing a stamp tax, real estate Transfer Tax, mortgage recording tax or similar tax, including any such taxes due on the sale of the Property as contemplated by the Plan, and to the extent provided by 1146(a), if any, shall not be subject to any state, local of federal law imposing such tax.

6.5 **Vesting of Assets**. Except as otherwise provided in the Plan, on the Effective Date all of the Debtor's remaining assets (excluding the Property which shall vest in the Purchaser at Closing), if any, shall vest in the Liquidating Debtor, free and clear of all Liens, Claims and encumbrances. On the Effective Date, any and all Liens, Claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date. Following the Effective Date, the Liquidating Debtor may operate, buy, use, acquire, and dispose of the property of the Estate and may settle and compromise any claims, interests and causes of action in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

6.6     **Execution of Documents.**

(a)     As soon as practicable after the Confirmation Date, the Liquidating Debtor, and any necessary party thereto, shall execute, release and deliver all documents reasonably necessary to consummate the transactions contemplated by the terms and conditions of the Plan. The Conformation Order and any sale order will provide for the Closing to be free and clear of any and all liens claims and encumbrances on the Property.

(b)     Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, the Debtor shall be authorized to execute, in the name of any necessary party any estoppel certificate, or any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance (including, any Lien, Claim or encumbrance that is to be released and satisfied upon the Debtor's compliance with the provisions of article 4 of the Plan) not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation, and the Confirmation Order shall expressly so provide.

6.7     **Filing of Documents.** Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every federal, state and local governmental agency or department, shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Plan.

6.8     **Preservation of Rights of Action.**

(a) Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement entered into in connection with the Plan, the Liquidating Debtor shall retain any claims, rights and causes of action (i) arising under sections 510 and 544 through 550 of

the Bankruptcy Code or (ii) belonging to the Debtor as of the Petition Date, or the Estate of the Debtor, and arising under any provision of state or federal law, or any theory of statutory or common law or equity.

(b)     Any recovery received by the Liquidating Debtor through the prosecution, settlement or collection of any such claim, right or cause of action, shall be retained by the Liquidating Debtor following the satisfaction of all other Allowed Claims under the terms of the Plan.

(c)     Notwithstanding any provision of the Plan to the contrary, definitions and descriptions contained herein respecting pre-Petition Date documents, agreements or claims are provided solely for the purpose of identification and classification thereof and do not constitute an admission by the Debtor of the existence, validity allowance, or amount of any such claim, document or agreement. The Debtor and the Liquidating Debtor expressly reserve the right to challenge the existence, validity, allowance, or amount of any such claim, document or agreement.

6.9     **Post-Confirmation Management and Compensation**. The Liquidating Debtor will be managed by GC Realty Advisors LLC until the Debtor is dissolved. The Debtor will continue in existence post-confirmation as the Liquidating Debtor temporarily, provided, however, that the Liquidating Debtor shall take such steps as are necessary to dissolve its existence in accordance with applicable non-bankruptcy law as soon as practicable after all distributions are made and claims objections are prosecuted under this Plan. Under no circumstances shall the Debtor engage in business other than related to the wind down of the Debtor after confirmation of the Plan.

## ARTICLE 7

## PROVISIONS GOVERNING DISTRIBUTIONS

7.1     **Disbursing Agent.** Other than Payments to be made at Closing, the Disbursing Agent shall distribute all Cash or other property to be distributed under the Plan and may employ or contract such third parties as may be necessary to assist in or perform the distribution of Cash or other property under the Plan. Pending the final distribution of all sums distributable under the terms of the Plan (including the delivery to the Liquidating Debtor of unclaimed distributions pursuant to section 7.14 of the Plan), the Disbursing Agent shall have full authority to sign checks on any bank account of the Liquidating Debtor to the extent necessary to make any payment or distribution contemplated by the Plan.

7.2     **Timing of Distributions Under the Plan.** Subject to sections 7.6 and 7.8 of the Plan, any payments, distributions or other performance to be made pursuant to the Plan on account of any Disputed Claim, shall be deemed to be timely made if made on or within five days following the later of (i) the Closing or (ii) the expiration of any applicable objection deadline with respect to Disputed Claims or (iii) such other times provided in the Plan. All Secured Claims shall be paid at the Closing.

7.3     **Method of Payment.** Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank.

7.4     **Claims Objection Deadline.** Unless otherwise ordered by the Bankruptcy Court for cause, objections to the allowance of any Claim may be filed no later than the later to occur of (i) 60 days after the Effective Date or (ii) 60 days after the date proof of such Claim or Interest or a request for payment of such Claim is filed. Until the earlier of (i) the filing of an objection to a Proof of Claim or (ii) the last date to file objections to Claims as established by the Plan or by Final Order, Claims shall be deemed to be Disputed in their entirety if, (i) the amount specified in a Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules; (ii) any

corresponding Claim listed in the Schedules has been scheduled as disputed, contingent or unliquidated; or (iii) no corresponding Claim has been listed in the Schedules.

Notwithstanding the foregoing, the Debtor shall not object to the undisputed portion of the E Village Lender Secured Claim which has been fixed as of November 14, 2017, in the amount of $6,145,412.40, as set forth in the attached Exhibit B, which amount includes legal fees due lender's counsel through September 30, 2017. Subject to the Closing taking place on or before March 1, 2018, legal charges will be capped at $49,000. Debtor reserves all rights to object to: any legal charges accruing after October 1, 2017 to the extent the Closing does not take place on or before March 1, 2018; and any other charges accruing after October 10, 2017, other than default interest accruing at the rate of $1,324.60 per diem, in connection with the E Village Lender Secured Claim.

7.5     **Prosecution of Objections.**   After the Confirmation Date, only the Liquidating Debtor shall have authority to file, settle, compromise, withdraw or litigate to judgment objections to Disputed Claim. The Liquidating Debtor may comprise any objections to Disputed Claims without further order of the Court.

7.6     **No Distribution Pending Allowance.** Notwithstanding any other provision of the Plan, no payment or distribution of any kind shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order.

7.7     **Escrow of Cash Distributions.** (a) On any date that distributions are to be made under the terms of the Plan, the Liquidating Debtor shall make available any and all funds required under Plan to be disbursed on that date, and the Disbursing Agent shall deposit in one or more segregated accounts, Cash or property equal to 100% of the Cash that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but

for the pendency of a dispute with respect thereto, including, but not limited to (i) Disputed Claims that may be entitled to treatment as Administrative Claims or as Priority Non-Tax Claims pursuant to sections 503 and 507 of the Bankruptcy Code, (ii) claims of Governmental Units for any tax, (iii) any disputed Cure Amount, and (iv) any amount due but not payable on the Closing, on account of Administrative Claims or claims entitled to priority pursuant to section 503 and 507 of the Bankruptcy Code. The Disbursing Agent shall also segregate any interest, dividends or other proceeds of such Cash. Such Cash together with any interest, dividends or proceeds thereof, be held in trust for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

(b)     The Liquidating Debtor shall have the right to seek an Order of the Bankruptcy Court, after notice and hearing, estimating or limiting the amount of Cash that must be so deposited on account of any Disputed Claim. Any Creditor whose Claim is so estimated shall have no recourse to any assets theretofore distributed on account of any Allowed Claim if the Allowed Claim of that Creditor as determined by Final Order exceeds the amount so deposited. Such Creditor shall have recourse first, to the undistributed assets in the Disputed Claims Reserve (on a Pro Rata basis with other Creditors of the same Class who are similarly situated) that exceed the aggregate amount of all Disputed Claims allowed by Final Order, or not yet resolved, and second any unpaid amount shall be an obligation of the Liquidating Debtor.

7.8     **Distribution After Allowance.** Within 15 days after the entry of a Final Order resolving an objection to a Disputed Claim, the Disbursing Agent shall distribute all Cash or other property, including any interest, dividends or proceeds thereof, to which a Holder is then entitled with respect to any formerly Disputed Claim that has become an Allowed Claim.

7.9    **Investment of Segregated Cash.**  To the extent practicable, the Disbursing Agent may invest any Cash segregated on account of a Disputed Claim, disputed Interest, undeliverable distribution, or any proceeds thereof (i) in a manner that will yield a reasonable net return taking into account the safety of the investment or (ii) in any manner permitted by section 345 of the Bankruptcy Code; *provided, however,* that the Disbursing Agent shall be under no obligation to so invest such Cash or proceeds and shall have no liability to any party for any investment made or any omission to invest such Cash or proceeds.  Segregated Cash shall be maintained in an authorized depository.

7.10    **Distribution After Disallowance.**  Subject to section 7.7 of the Plan, the Cash segregated on account of Disputed Claims, including the allocable portion of the net return yielded from any investment thereof, if any, remaining after all Disputed Claims have been resolved by Final Order shall revert to the Liquidating Debtor.

7.11    **Surrender of Instruments; Execution of Satisfactions and Releases.**

(a) Notwithstanding any other provision of the Plan, no Creditor, that holds a note or other instrument evidencing such Creditor's Claim may receive any distribution with respect to such Claim, unless and until the original note or other original instrument evidencing such Claim shall have been validly surrendered to the Disbursing Agent at the sole cost and expense of such Creditor.

(b)    Any Cash or property to be distributed pursuant to the Plan on account of any such Claim shall, pending surrender, be treated as an undeliverable distribution pursuant to section 7.13 of the Plan.

(c)    In the event any Creditor is unable to surrender a note or other instrument evidencing a Claim against the Debtor that has been destroyed, lost or stolen, such entity

may receive a distribution with respect to such Claim by presenting to the Disbursing Agent, in a form acceptable to the Disbursing Agent: (i) proof of such entity's title to such Claim; (ii) an affidavit to the effect that the same has been lost and after diligent search cannot be located; and (iii) such indemnification as may be required by the Disbursing Agent and all other entities deemed appropriate by the Disbursing Agent from any loss, action, suit or any claim whatsoever which may be made as a result of such entity's receipt of a distribution under the Plan.

(d)     All questions as to the validity, form or eligibility of any note or other instrument evidencing a Claim so surrendered shall be resolved by Final Order of the Bankruptcy Court. The Disbursing Agent shall not be under any duty to give notification of defects in such tender or shall incur liability for failure to give notification of such defects.

7.12     **Delivery of Distributions.** Except as provided in sections 7.13, 7.14 and 7.15 of the Plan, distributions to Holders of Allowed Claims and Allowed Interests shall be made: (1) at the addresses set forth on the respective Proofs of Claim or Proofs of Interests filed by such Holders; (2) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (3) at the address reflected in the Schedules if no Proof of Claim or Proof of Interest is filed and the Disbursing Agent has not received a written notice of a change of address.

7.13     **Undeliverable Distributions.** (a) If the distribution to the Holder of any Claim or Interest is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then current address. Undeliverable distributions shall remain in the possession of the Disbursing Agent until the earlier of (i) such time as a distribution becomes deliverable or (ii) such undeliverable distribution becomes an unclaimed distribution pursuant to section 7.14 of the Plan.

(b)     Until such time as an undeliverable distribution becomes an unclaimed distribution pursuant to section 7.14 of the Plan, within 30 days after the end of each calendar quarter following the Closing, the Disbursing Agent shall make distributions of all Cash that has become deliverable during the preceding quarter.  Each such distribution shall include the net return yielded from the investment of any undeliverable Cash, from the date such distribution would have been due had it then been deliverable to the date that such distribution becomes deliverable.

(c)     Nothing contained in the Plan shall require the Liquidating Debtor to attempt to locate any Holder of an Allowed Claim or an Allowed Interest.

7.14     **Unclaimed Distributions.**  Any Cash or other assets to be distributed under the Plan shall revert to the Liquidating Debtor if it is not claimed by the entity entitled thereto before the later of (i) one year after the Closing; (ii) one year after such scheduled payment to such entity under Article 4 of this Plan; or (iii) one year after an Order allowing the Claim of that entity becomes a Final Order, and such entity's claim shall be reduced to zero.

7.15     **Set-offs.**  The Liquidating Debtor, as Disbursing Agent, may, but shall not be required to, set-off against the distributions to be made pursuant to the Plan, the claims, obligations, rights, causes of action and liabilities of any nature that the Liquidating Debtor may hold against the Holder of an Allowed Claim, *provided, however,* that neither the failure to effect such a set-off nor the allowance of any claim hereunder shall constitute a waiver or release by the Liquidating Debtor of any such claims, obligations, rights, causes of action and liabilities that the Debtor (or the Liquidating Debtor) has or may have against such Holder.  To the extent the Liquidating Debtor elects to effectuate a set-off, it shall notify the Holder of the Allowed Claim in writing at least ten (10) days prior to effectuating the set-off.  To the extent the Holder of an Allowed Claim objects to

the set-off, a written objection shall be provided to the Liquidating Debtor, as Disbursing Agent, no later than three (3) days prior to the set-off date or the objection shall be waived.

## ARTICLE 8

### INJUNCTION AND EXCULPATION

8.1 **Injunction.** Except (i) as otherwise provided in the Plan or (ii) in any Final Order, all persons who have held, hold, or may hold Claims against, or Interests in, the Debtor that arose before or were held as of the Closing, are permanently enjoined, on and after the Closing, from the commencement or continuation of any action, the employment of process, from taking any act to collect, enforce, attach, recover or offset against such claim and taking any act to create, perfect or enforce any lien or encumbrance against property of the Estate retained by the Liquidating Debtor or distributed to Creditors under this Plan.

8.2 **Limitation of Liability.** Section 1125(e) of the Bankruptcy Code, commonly referred to as the "safe harbor," protects persons acting in good faith, from civil claims arising in connection with solicitations of acceptances of plans of reorganization or participating in the offer, issuance, sale or purchase of a security under the Plan. Pursuant to section 1125(e), as set forth in Article 8 of the Plan, neither the Debtor, the Interest Holders nor any of their respective officers, directors, members, general partner, managers or employees (acting in such capacity), nor any professional person employed by any of them (the "**Released Parties**") shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with this case or the Plan except in the case of fraud, gross negligence, willful

misconduct, malpractice, breach of fiduciary duty, criminal conduct, unauthorized use of confidential information that causes damages, or ultra vires acts. Nothing contained herein shall limit the liability of the Debtor's professionals pursuant to Rule 1.8(h)(1) of the New York State Rules of Professional Conduct. From and after the Closing, a copy of the Confirmation Order and the Plan shall constitute, and may be submitted as, a complete defense to any claim or liability released pursuant to Article 8 of the Plan.

8.3    **Release**. Except as otherwise provided in the Plan, upon the Closing, in consideration of the Cash and other property to be distributed to or on behalf of the holders of Claims and Interests under the Plan, the Plan shall be deemed to resolve all disputes and constitute a settlement and release, between and among the Debtor, on the one hand, and each Creditor and Interest Holders, on the other, from any claim or liability, whether legal, equitable, contractual, secured, unsecured, liquidated, unliquidated, disputed, undisputed, matured, unmatured, fixed or contingent, known or unknown, that the Debtor, its Creditors or Interest Holders ever had or now have through the Closing in connection with their Claim or Interests (including, without limitation, any claims the Debtor may assert on its own behalf or on behalf of Creditors or Interest Holders pursuant to sections 510 and 542 through 553 of the Bankruptcy Code, any claims Creditors or Interest Holders may have asserted derivatively on behalf of the Debtor absent bankruptcy, any claims based on the conduct of the Debtor's business affairs prior or subsequent to the commencement of the Case or any claims based on the negotiation, submission and confirmation of the Plan), provided however that nothing in the Plan or the Confirmation Order shall effect a release of any claim for any debt owed to the United States Government arising under the Internal Revenue Code; any state, city or municipality arising under any state, city or municipal tax code; any environmental laws or any criminal laws of the

United States or any state, city or municipality. Nothing in the Confirmation Order or the Plan shall enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any claim, suit or action arising under the Internal Revenue Code, any state, city or municipal tax code, the environmental laws or any criminal laws of the United States or any state, city or municipality. Nothing in the Confirmation Order or the Plan shall exculpate any party from any liability to the United States Government or any of its agencies or any state, city or municipality arising under the Internal Revenue Code, any state, city or municipal tax code, the environmental laws or any criminal laws of the United States or any state.

<center>ARTICLE 9</center>

<center>MISCELLANEOUS PROVISIONS</center>

9.1 **Orders in Aid of Consummation.** Pursuant to sections 105, 1141, 1142 and 1143 of the Bankruptcy Code, the Bankruptcy Court may enter one or more Orders in aid of Confirmation directing the implementation of matters or actions required by the Plan.

9.2 **Compliance with Tax Requirements.** In connection with the Plan, the Liquidating Debtor (and in its capacity as the Disbursing Agent) shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities and distributions under the Plan shall be subject to such withholding and reporting requirements; *provided, however,* that the transfer of any Cash, or other assets or interests hereunder shall not be subject to any federal, state or local tax to the fullest extent provided under section 1146 of the Bankruptcy Code.

9.3 **Due Authorization by Creditors.** Each and every Creditor who accepts the distributions provided for under the Plan warrants that it is the lawful owner of such Claim and is authorized to accept the distributions provided for in the Plan and that there are no outstanding Liens,

encumbrances, commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights released, conveyed or modified by the Plan, or obligations undertaken by such Creditor under the Plan.

9.4     **Amendments.** The Plan may be altered, amended or modified by the Debtor, in writing, signed by the Debtor, at any time before the substantial consummation of the Plan, as provided in sections 1101 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.   Any substantive modification shall require notice and a hearing before the Bankruptcy Court for approval of the proposed modification of the Plan. The Liquidating Debtor in its own capacity and as the Disbursing Agent shall be deemed a Plan proponent for purposes of Section 1127 of the Bankruptcy Code.

9.5     **Revocation.**  The Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order.  If the Plan is revoked or withdrawn or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtor; or (ii) prejudice in any manner the rights of the Debtor or any other party in any further proceedings involving the Debtor or its Estate, except that the Debtor's exclusive period within which to file a plan of reorganization pursuant to Bankruptcy Code § 1121 will be deemed to have terminated as of the date and time the Plan is revoked or withdrawn.

9.6     **Request for Relief Under Section 1129(b).**  If the Plan is accepted by one or more, but not all, impaired Classes of Claims, the Debtor may request confirmation under section 1129(b) of the Bankruptcy Code of any Class of Claims, subject to any modification of the Plan made pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

9.7 **Filing of Additional Documents.** Except as otherwise provided in the Plan, on or before the Effective Date, the Debtor may file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, and Debtor shall be responsible for the preparation and filing of any reports necessary until the entry of a Final Decree. Debtor shall also pay any fees due the U.S. Trustee's Office until entry of a Final Decree.

9.8 **Section Headings.** The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

9.9 **Computation of Time.** In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

9.10 **Successors and Assigns.** The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

9.11 **Notices.** All notices and other communications to be given or made hereunder shall be in writing and shall be deemed to have been given or made when mailed or as otherwise set forth herein:

(a) if to the Debtor, at Robinson Brog Leinwand Greene Genovese & Gluck, P.C., 875 Third Avenue, 9th floor, New York, New York 10022, attn: A. Mitchell Greene, Esq.;

(b) if to any Creditor or Interest Holder, at (i) the addresses set forth on the respective Proofs of Claim or Proofs of Interests filed by such Holders; (ii) the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related

Proof of Claim; or (iii) the address reflected in the Schedules if no Proof of Claim or Proof of Interest is filed and the Disbursing Agent has not received a written notice of a change of address;

        (c)     if to any entity that has filed a notice of appearance, at the addresses set forth on such notice of appearance.

        (d)     if to Purchaser, at Kordas & Marinis, 544 47th Avenue, Long Island City, New York 11101, Attn:  Nicholas Kordas

        9.12    **Governing Law.** Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other Federal law are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the laws of the State of New York without giving effect to the principles of conflict of laws thereof.

        9.13    **Other Actions.**  Nothing contained herein shall prevent the Debtor, Interest Holder, or Creditors from taking such actions as may be reasonably necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan.

        9.14    **Severability.**  In the event any provision of the Plan is determined to be unenforceable such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of the Plan.

        9.15    **Business Day.**  In the event that the Plan requires an act to be performed on a day that is not a Business Day, such act shall be performed on the first Business Day thereafter.

## ARTICLE 10

### RETENTION OF JURISDICTION

        10.1    **Retention of Jurisdiction.**  Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, until the Case is closed, the Bankruptcy Court shall retain and have original, but not exclusive, jurisdiction to:

(a) Insure that the Plan is consummated, and to enter any Order pursuant to section 1142(b) of the Bankruptcy Code, to compel the Debtor, Interest Holders and any other necessary party, to take such action and execute such documents to effectuate the Plan;

(b) Consider any modification of the Plan proposed pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019;

(c) Allow, disallow, determine, liquidate, classify or establish the priority, secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense, the resolution of any and all objections to the allowance or priority of Claims or Interests, and the resolution of any adversary proceeding;

(d) Grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for any period ending on or before the Closing;

(e) Resolve any motions pending as of the Closing, to assume, assume and assign or reject any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine and if necessary, liquidate, any and all Claims arising therefrom;

(f) Ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished in accordance with the provisions of this Plan;

(g) Decide or otherwise resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters or grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(h) Enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements

or documents created in connection with the Plan or Disclosure Statement or to enforce all orders, judgments, injunctions, and rulings entered in connection with the Case, including, but not limited to any Order necessary to enforce the provisions of article 7 of the Plan;

(i) Resolve any and all controversies, suits or issues that may arise in connection with the consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

(j) Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, or to modify the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan or Disclosure Statement;

(k) Remedy any defect or omission or reconcile any inconsistency in any Order, the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan, to the extent authorized herein or in the Bankruptcy Code;

(l) Issue any injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

(m) Enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(n) Determine any dispute arising under or related to the Plan, including, without limitation, any dispute concerning the scope or effect of any release or discharge provided for by the Plan or the Confirmation Order.

(o)     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or Disclosure Statement; and

(p)     Enter an Order of Final Decree concluding the Case.

10.2     **Post-Closing Jurisdiction.**  Notwithstanding the entry of a final decree or an order closing the Case, the Bankruptcy Court shall retain jurisdiction to reopen the Case for the purpose of enforcing, by injunction or otherwise, the terms of the Plan, the Confirmation Order and any final decree, including, without limitation, the enforcement of any rights of the Debtor.

## ARTICLE 11

### CONDITION TO THE EFFECTIVE DATE

11.1     **Conditions Precedent to Effectiveness.**  The Plan shall not become effective unless and until it has been confirmed and the following conditions have been satisfied or waived in full: (a) The Confirmation Order shall have been entered in this case and no stay or injunction shall be in effect precluding the consummation of the transactions contemplated by this Plan and the Confirmation Order shall not have been modified or vacated on appeal; and (b) Closing of the sale of the Property to Purchaser has occurred.

# ARTICLE 12

## CLOSING THE CASE

12.1 **Substantial Consummation.** Until the occurrence of the Closing, and substantial consummation of the Plan, the Liquidating Debtor, its Property and its Creditors shall be subject to further Orders of the Bankruptcy Court.

12.2 **Closing the Case.** Upon the substantial consummation of the Plan, the Liquidating Debtor shall expeditiously move for the entry of a final decree closing the Case and such other relief as may be just and appropriate.

**Dated:** New York, New York
November 15, 2017

E. 9TH STREET HOLDINGS LLC
By: GC REALTY ADVISORS, LLC AS MANAGER

By_____
DAVID GOLDWASSER
AUTHORIZED SIGNATORY
GC REALTY ADVISORS, LLC

ROBINSON BROG LEINWAND
 GREENE GENOVESE & GLUCK P.C.
Attorneys for the Debtor
875 Third Avenue, 9th Floor
New York, New York 10022
Tel. No.:  (212) 603-6300

By: /s/ A. Mitchell Greene
        A. Mitchell Greene

# EXHIBIT A

# AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE ("Agreement") made as of the 19th day of June 2017 by and between E. 9TH ST. HOLDINGS LLC, a New York limited liability company, with its principal place of business c/o FIA Capital Partners LLC, 7280 West Palmetto Park Road, Suite 203-N, Boca Raton, Florida 33433 ("Seller") and 332 EAST 9TH LLC, a New York limited liability company, having an address at 1946 Coney Island Avenue, Brooklyn, New York 11223 ("Purchaser"). (The parties acknowledge that the Purchaser has not yet been formed, and the signatory to this agreement shall have no liability under this contract based on the non-formation of the Purchaser entity.)

# WITNESSETH:

1.     Agreement to Sell and Purchase; Description of Property.

        Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, upon the terms and conditions hereinafter contained, all right, title and interest of Seller in and to (a) those certain lots, pieces or parcels of land located at 332 East 9th Street, in the Borough of Manhattan, City, County and State of New York, as more particularly bounded and described in **Exhibit A** attached hereto and hereby made a part hereof (the "Land") together with (i) the building(s) erected thereon (collectively, the "Building") and any and all other fixtures and improvements erected thereon (the Building and such other fixtures and improvements being hereinafter collectively referred to as the "Improvements"); (ii) the land lying in the bed of any street, highway, road or avenue, opened or proposed, public or private, in front of or adjoining the Land, to the center line thereof, (iii) any rights of way, appendages, appurtenances, easements, sidewalks, alleys, gores or strips of land adjoining or appurtenant to the Land or any portion thereof and used in conjunction therewith, (iv) any development rights appurtenant to the Land or any portion thereof and (v) any award or payment made or to be made in lieu of any of the foregoing or any portion thereof and any unpaid award for damage to the Land or any of the Improvements by reason of change of grade or closing of any street, road or avenue, it being understood and agreed that Seller will execute and deliver to Purchaser on the Closing Date (as hereinafter defined) or thereafter (which obligation shall survive the Closing (as hereinafter defined)), upon reasonable written request, all proper instruments for the conveyance of such right, title and interest and for the assignment and collection of any such awards or payments, without representation or warranty by or recourse to Seller, (b) all fixtures, machinery, tangible personal property and equipment (excluding furniture, furnishings, equipment and other personal property of Tenants (as hereinafter defined)) used in connection with or attached or appurtenant to or at or upon all or any portion of the Land and the Improvements at the date hereof, including, without limitation, such fire protection, heating, plumbing, electrical and air conditioning systems as now exist thereat, (c) the interest of the landlord in and to all Leases (as hereinafter defined) of all or any portion of the Land and the Improvements, and all security deposits held by Seller thereunder on the Closing Date, and (d) to the extent assignable, permits and licenses, if any, held solely for use in connection with all or any portion of the Land and the Improvements.

All of the above enumerated property, rights and interests to be sold to Purchaser pursuant to this Agreement (including, without limitation, the Improvements erected on the Land or any part thereof) are hereinafter sometimes collectively referred to as the "Property."

2.      <u>Exceptions to Title; Title Matters.</u>

     2.1    The Property is sold and shall be conveyed subject to the following (the "<u>Permitted Exceptions</u>"):

     2.1.1    All presently existing and future liens for unpaid real estate taxes and water and sewer charges not due and payable as of the date of the Closing, subject to adjustment as hereinbelow provided.

     2.1.2    All present and future zoning, building, environmental and other laws, ordinances, codes, restrictions and regulations of all governmental authorities having jurisdiction with respect to the Property, including, without limitation, landmark designations and all zoning variances and special exceptions, if any (collectively, "<u>Laws and Regulations</u>").

     2.1.3    All covenants, restrictions and rights and all easements and agreements for the erection and/or maintenance of water, gas, steam, electric, telephone, sewer or other utility pipelines, poles, wires, conduits or other like facilities, and appurtenances thereto, over, across and under the Property (collectively, "<u>Rights</u>").

     2.1.4    Any state of facts which would be shown on or by an accurate current survey of the Property (collectively, "<u>Facts</u>").

     2.1.5    Rights of tenants of the Property, as set forth on **<u>Exhibit B</u>** attached hereto and made a part hereof, pursuant to leases with Seller or any predecessor fee owner of the Property or other statutory tenants (collectively, "<u>Leases</u>") and others claiming by, through or under the tenants (collectively, "<u>Tenants</u>").

     2.1.6    All service, maintenance, supply and other contracts in connection with the Property set forth on **<u>Exhibit C</u>** attached hereto and made a part hereof, and all renewals, replacements, extensions of same or additional service contracts that may hereafter be entered into (collectively, "<u>Service Contracts</u>").

     2.1.7    All violations of building, fire, sanitary, environmental, housing and similar Laws and Regulations whether or not noted or issued at the date hereof or at the date of the Closing (collectively, "<u>Violations</u>"), but Seller shall pay for any monetary fines or penalties imposed as a result thereof, including amounts necessary to satisfy emergency repair charges, boiler and elevator permit or inspection fees.

     2.1.8    Consents by Seller or any former owner of the Property for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

2.1.9  Possible encroachments and/or projections of stoop areas, roof cornices, window trims, vent pipes, cellar doors, steps, columns and column bases, flue pipes, signs, piers, lintels, window sills, fire escapes, satellite dishes, protective netting, sidewalk sheds, ledges, fences, coping walls (including retaining walls and yard walls), air conditioners and the like, if any, on, under or above any street or highway, the Property or any adjoining property.

2.1.10  Minor Variations of less than twelve inches between tax lot lines and lines of record title.

2.1.11  Standard conditions and exceptions to title contained in the form of title policy or "marked-up" title commitment employed by the Title Company (as hereinafter defined).

2.1.12  Any financing statements, chattel mortgages, encumbrances or mechanics' or other liens entered into by, or arising from, any financing statements filed on a day more than five (5) years prior to the Closing and any financing statements, chattel mortgages, encumbrances or mechanics' or other liens filed against property no longer on the Property, provided the Title Company (as hereinafter defined) will omit same from Purchaser's Owner's policy.

2.1.13  Any lien or encumbrance (including, without limitation, any mechanics' and materialmen's lien) the removal of which is the obligation of a Tenant pursuant to the related Lease.

2.1.14  The matters described in **Exhibit D** attached hereto and made a part hereof.

2.1.15  Any restrictive covenants, conditions, agreements, reservations, encroachments, easements and rights of way of record; and any other restrictive covenants, conditions, agreements, reservations, encroachments, easements and rights of way provided that same do not prevent the current use of the present structures on the Property.

2.1.16  Designation of the Property as historical landmarks or being within a landmark district.

2.1.17  Any other matter which the Title Company may raise as an exception to title, provided the Title Company will insure against collection or enforcement of same out of the Property and/or that no prohibition of present use or maintenance of the Property will result therefrom, as may be applicable.

2.2  Purchaser agrees promptly upon the execution of this Agreement at its sole cost and expense to cause title to the Property to be examined by any reputable title insurer licensed to issue title insurance in the State of New York and acceptable to Seller in Seller's sole discretion (the "Title Company"). Purchaser further agrees that not later than ten (10) days after Purchaser's receipt of the Title Report, Purchaser's attorney will furnish to Seller's attorneys an emailed version of the title report along with an emailed list of objections (the "Title Report Objection Notice") that will address any exceptions to title to the Property set forth in the Title

Report known to Purchaser which Purchaser believes are not covered by the exceptions to title set forth in Section 2.1. Seller acknowledges that the Title Report Objection Notice can be sent via email. If after giving such notice to Seller, Purchaser learns through continuation reports of any title defect(s) which Purchaser claims are not covered by Section 2.1 above, Purchaser shall give notice thereof to Seller immediately after the date Purchaser learns of same. If, after giving the Title Report Objection Notice to Seller, continuation reports or other written evidence, indicating any title defect(s) which are not covered by Section 2.1 hereof and "subject to" which Purchaser is not required to accept title, receipt of such continuation reports or other written evidence of such title defects by Seller's attorneys shall constitute notice of objection to such title defects as if same were set forth in the Title Report Objection Notice. In the event the title company selected by Purchaser pursuant to the first sentence of this Section 2.2 fails or refuses to insure title for any reason or no reason, Seller may substitute any other reputable title company licensed to do business in the State of New York that will provide such insurance, or an abstract company writing through such a title company, without any additional premium payable by Purchaser, in which event Seller's substituted title company shall, for purposes of this Agreement be the "Title Company."

2.3     If, on the Closing Date, Seller fails or is unable to convey to Purchaser title to the Property subject to and in accordance with the provisions of this Agreement, Seller shall be entitled, upon written notice delivered to Purchaser on or prior to the Closing Date, to reasonable adjournments of the Closing one or more times for a period not to exceed ninety (90) days in the aggregate to enable Seller to convey such title to the Property (provided said adjournment does not jeopardize Purchaser's financial arrangements). If Seller does not so elect to adjourn the Closing, or if at the adjourned date Seller is unable to convey title subject to and in accordance with the provisions of this Agreement, Purchaser may terminate this Agreement by written notice to Seller and Escrow Agent (as hereinafter defined) delivered on or promptly after the date scheduled for the Closing, in which event Escrow Agent shall repay to Purchaser the Downpayment (as hereinafter defined), together with any interest earned thereon, subject to Section 23 hereof. This Agreement shall thereupon be deemed canceled and become void and of no further effect, and neither party hereto shall have any obligations of any nature to the other hereunder or by reason hereof, except for those provisions which are intended to survive such termination. If Seller elects to adjourn the Closing as provided above, this Agreement shall remain in effect for the period or periods of adjournment, in accordance with its terms. Seller shall be required to take or bring any action or proceeding or any other steps to remove any consensual lien, Purchaser shall have any right of action against Seller therefor, at law or in equity.

2.4     Notwithstanding anything in Section 2.3 above to the contrary, Purchaser may at any time accept such title as Seller can convey, without reduction of the Purchase Price (as hereinafter defined) or any credit or allowance on account thereof or any claim against Seller. The acceptance of the Deed (as hereinafter defined) by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Seller's part to be performed under this Agreement.

2.5     The amount of any unpaid taxes, assessments, water and sewer charges, and fines which Seller is obligated to pay and discharge, with interest and penalties, may at the option of Seller be allowed to Purchaser out of the balance of the Purchase Price, if official bills

therefor with interest and penalties thereon figured to said date are furnished to or obtained by the Title Company at the Closing for payment thereof.

2.6    If the Property shall, at the time of the Closing, be subject to any liens such as for judgments or transfer, inheritance, estate, franchise, license or other similar taxes or any encumbrances or other title exceptions which would be grounds for Purchaser to reject title hereunder, the same shall not be deemed an objection to title provided that, at the time of the Closing, either (a) Seller uses all or a portion of the Purchase Price and delivers to Purchaser and/or the Title Company at the Closing instruments in recordable form sufficient to satisfy and discharge of record such liens and encumbrances together with the cost of recording or filing such instruments or (b) the Title Company will otherwise issue or bind itself to issue a policy which will insure Purchaser against collection thereof from or enforcement thereof against the Property. If a request is made, Purchaser agrees to provide at the Closing separate certified or official bank checks as requested aggregating the amount of the cash to be paid by Seller to satisfy the aforesaid, to facilitate the satisfaction of any of such liens or other defects.

3.    Purchase Price and Payment
3.1 The purchase price payable to Seller for the Property is NINE MILLION SIX HUNDRED THOUSAND AND 00/100 ($9,600,000.00) DOLLARS (the "Purchase Price"), subject to such apportionments, adjustments and credits as are provided herein.

3.2    The Purchase Price shall be payable as follows:

3.2.1    THREE HUNDRED THOUSAND AND 00/100 ($300,000.00) DOLLARS (the "Downpayment") simultaneously with the execution and the delivery of this Agreement by federal funds wire transfer to an account at such bank or banks as designated by Goldberg Rimberg & Weg PLLC, 115 Broadway, Suite 302, New York, New York 10006, as escrow agent (the "Escrow Agent"). The Downpayment will be held in escrow by the Seller's attorney as agent for the Seller in accordance with the terms of this contract.

3.2.2    NINE MILLION THREE HUNDRED THOUSAND AND 00/100 ($9,300,000.00) DOLLARS shall be paid to Seller on the date of the Closing, subject to the apportionments, adjustments and credits referenced herein, simultaneously with the delivery of the Deed by federal funds wire transfer of immediately available funds to an account at such bank or banks as shall be designated by Seller.

The Downpayment shall be held by Escrow Agent and disbursed in accordance with the terms and conditions of this Agreement. Any interest earned on the Downpayment shall be deemed to be part of the Downpayment and shall be paid together with the principal portion of the Downpayment, it being understood and agreed that any interest earned on the Downpayment shall not be credited to the Purchase Price upon the Closing and shall, upon the Closing, be and remain the property of Seller.

3.3    Purchaser expressly agrees and acknowledges that Purchaser's obligations hereunder are not in any way conditioned upon or qualified by Purchaser's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt financing or equity

investment, or otherwise) to consummate the transaction contemplated hereby.

4.    Closing.

    4.1    The closing of the transaction contemplated hereby (the "Closing") shall occur at 10:00 A.M., New York City Time, on August 19, 2017, as the same may be adjourned by Seller pursuant to Section 2.3 hereof being herein referred to as the "Closing Date"). TIME SHALL BE OF THE ESSENCE WITH RESPECT TO PURCHASER'S OBLIGATIONS TO CLOSE ON THE CLOSING DATE.

    4.2    The Closing will occur at the offices of Goldberg Rimberg & Weg PLLC, 115 Broadway, Suite 302, New York, New York 10006, or, if required, at the offices of Purchaser's lender or its attorneys in the City of New York or Nassau County.

5.    "AS IS."

    5.1    Except as may otherwise be expressly set forth in the Agreement, Purchaser is expressly purchasing the Property in its existing condition "AS IS, WHERE IS, AND WITH ALL FAULTS" with respect to all facts, circumstances, conditions and defects. Seller has no obligation to determine or correct any such facts, circumstances, conditions or defects or to compensate Purchaser for same. Seller has specifically bargained for the assumption by Purchaser of all responsibility to investigate the Property, Laws and Regulations, Rights, Facts, and Violations and of all risk of adverse conditions and has structured the Purchase Price and other terms of this Agreement in consideration thereof. Purchaser has, as of the date hereof, undertaken all such investigations and review of the Property, Laws and Regulations, Rights, Facts, and Violations as Purchaser deemed necessary or appropriate under the circumstances as to the status of the Property and based upon same Purchaser is and will be relying strictly and solely upon such inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel and officers and Purchaser is and will be fully satisfied that the Purchase Price is fair and adequate consideration for the Property, and by reason of all the foregoing, Purchaser assumes the full risk of any loss or damage occasioned by any fact, circumstance, condition or defect pertaining to the Property.

    5.2    Seller hereby disclaims all warranties of any kind or nature whatsoever (including warranties of habitability and fitness for particular purposes), whether expressed or implied, including, without limitation, warranties with respect to the Property. Purchaser acknowledges that, except as otherwise expressly provided in this Agreement, Purchaser is not relying upon any representation of any kind or nature made by Seller, or any of its employees or agents with respect to the Property, and that, in fact, no such representations were made except as expressly set forth in this Agreement.

    5.3    Seller makes no warranty with respect to the presence of Hazardous Materials (as hereinafter defined) on, above or beneath the Land (or any parcel in proximity thereto) or in any water on or under the Property. Purchaser's closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be joined in any action brought under any Environmental Laws (as hereinafter defined). The term "Hazardous Materials" shall mean (a) those substances included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial

wastes," and "toxic pollutants," as such terms are defined under the Environmental Laws, or any of them, (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (c) natural gas, synthetic gas and any mixtures thereof, (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable, (e) polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (f) radon, (g) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, and (h) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring or remediation. The term "Environmental Laws" shall mean all federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601, et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801, et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136, et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. §§ 6901, et seq.) ("RCRA"), the Toxic Substance Control Act, as amended (42 U.S.C. §§ 7401, et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401, et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251, et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651, et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f, et seq.), any state or local environmental law or counterpart or equivalent of any of the foregoing, and any Federal, state or local transfer of ownership notification or approval statutes.

        5.4     Purchaser acknowledges that Purchaser has had an adequate opportunity to make such legal, factual and other inquiries and investigation as Purchaser deems necessary, desirable or appropriate with respect to the Property. Such inquiries and investigations of Purchaser shall be deemed to include but shall not be limited to the review of any leases and contracts pertaining to the Property, the physical components of all portions of the Property, such state of facts as an accurate survey and inspection would show, the present and future zoning ordinances, resolutions and regulations of the City, County and State where the Property is located and the value and marketability of the Property. Purchaser, in purchasing the Property, has relied solely upon the tests, analyses, inspections and investigations that Purchaser makes, or has had the right to make, and opted not or otherwise failed to make, and not in reliance upon any alleged representation made by or on behalf of Seller except the express representations set forth herein.

        5.5     Without in any way limiting the generality of the preceding paragraphs, Purchaser shall rely solely upon Purchaser's own knowledge of the Property based on its investigation of the Property and its own inspection of the Property in determining the Property physical condition. Purchaser releases Seller and its respective successors and assigns from and against any and all claims which Purchaser or any party related to or affiliated with Purchaser has or may have arising from or related to any matter or thing related to or in connection with the Property, including the documents and information referred to herein, any construction defects,

errors or omissions in the design or construction and any environmental conditions, and Purchaser shall not look to Seller or its respective successors and assigns in connection with the foregoing for any redress or relief. This release shall be given full force and effect according to each of its express terms and provisions including those relating to unknown and unsuspected claims, damages and causes of action. The provisions of this Section 5 shall survive the termination of this Agreement or the Closing Date and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

     6.    <u>Apportionments.</u>

     6.1    At the Closing, the following items shall be apportioned between the parties as of 11:59 PM on the day preceding the Closing Date. Any errors in the apportionments pursuant to this Section 6 shall be corrected by appropriate re-adjustment between Seller and Purchaser post-closing, provided that notice of any such error, with supporting calculations, shall be given by Purchaser to Seller or by Seller to Purchaser, as the case may be, no later than ninety (90) days after the Closing, if ascertainable within such period, it being understood and agreed that if any such items or errors are not ascertainable at the Closing or within ninety (90) days thereafter, the apportionment shall be made subsequent to the Closing when the charge or error is determined. Except as otherwise specifically provided for herein, all apportionments shall be made in the manner recommended by the Customs in Respect to Title Closings of the Real Estate Board of New York, Inc., and there shall be no other apportionments. The items to be apportioned are:

     6.1.1    (a)    Rents payable by Tenants which are paid on or prior to the Closing in respect of the month (or other applicable collection period) in which the Closing occurs (the "<u>Closing Month</u>"), on a per diem basis, based upon the number of days in the Closing Month prior to the Closing Date (which shall be allocated to Seller) and the number of days in the Closing Month on and after the Closing Date (which shall be allocated to Purchaser).

     (b)    If, at the Closing, rent is past due by any Tenant, Purchaser agrees that the first moneys received by Purchaser from such Tenant shall be received and held by Purchaser in trust, and shall be disbursed as follows:

     (i)    First, to Seller and Purchaser in an amount equal to their proportionate share of such rents owing by such Tenant in respect of the Closing Month;

     (ii)    Next, to Purchaser, in an amount equal to all rent owing by such Tenant for all current periods after the Closing Month;

     (iii)    Next, to Seller, in an amount equal to all rent owing by such Tenant to Seller in respect of the calendar month immediately preceding the Closing month;

     (iv)    Next, to Seller, in an amount equal to all other rent owing by such Tenant to Seller in respect of all periods prior to the calendar month immediately preceding the Closing Month; and

(v)     The balance, if any, to Purchaser.

Each party agrees to remit reasonably promptly to the other the amount of such rents to which such party is so entitled and to account to the other party monthly in respect of same. Seller shall have the right from time to time for a period of ninety (90) days following the Closing, on reasonable prior notice to Purchaser, to review Purchaser's rental records with respect to the Property to ascertain the accuracy of such accountings. Purchaser shall have the right from time to time for a period of ninety (90) days following the Closing, on reasonable prior notice to Seller, to review Seller's rental records with respect to the Property to ascertain the accuracy of such accountings. The rent received by Seller after the Closing shall be apportioned and remitted, if applicable, as hereinabove provided.

(c)     If the Closing shall occur prior to the time when any rental payments for fuel pass-alongs, so-called escalation rent or charges based upon impositions (as described below), operating expenses, BID Taxes and assessments, labor costs, cost of living increases, percentage rents or other sums payable by the Tenant in addition to rent, or like items (collectively, "Overage Rent") is payable, then such Overage Rent for the applicable accounting period in which the Closing occurs shall be apportioned subsequent to the Closing. Purchaser agrees that it will receive in trust and pay over to Seller, within ten (10) days after Purchaser's receipt thereof, a prorated amount of such Overage Rent based upon the portion of such accounting period which occurs prior to the Closing (to the extent not theretofore collected by Seller on account of such Overage Rent prior to Closing). In addition, Purchaser agrees to receive and hold in trust for Seller any Overage Rent payable subsequent to the Closing with respect to an accounting period which expired prior to the Closing and pay, within ten (10) days after Purchaser's receipt thereof, the entire amount to Seller and shall account to Seller monthly in respect of same. Seller shall furnish to Purchaser all information with respect to the period prior to the Closing reasonably necessary for the billing of such Overage Rent. If, prior to Closing, Seller shall collect any sums on account of Overage Rent or fixed rent for a year or other period, beginning prior but ending subsequent to the Closing, such sum shall be apportioned at the Closing as of the date of Closing.

(d)     There shall be no adjustment for security deposits at Closing as per the attached **Exhibit B-1**.

(e)     Subsequent to the Closing, Purchaser agrees that it shall promptly render bills for and shall exercise reasonable diligence in the collection of any rent due to Seller pursuant to this Agreement. Purchaser's obligation to pay over to Seller rents collected as provided in this subsection 6.1.1 shall be an independent covenant of Purchaser and such payments shall be made promptly without any set off or deduction whatsoever, other than fees incurred to collect said rents. Nothing herein shall preclude Seller from asserting separate and independent claims against Tenants owing rent to which Seller is entitled hereunder, including, without limitation, the institution of such actions or proceedings as Seller shall deem necessary or advisable for the purpose of collecting such rent, except Seller shall not institute any summary dispossess, eviction or similar proceedings which affect the possessory rights of any Tenant.

6.1.2     Real estate taxes, unmetered water and sewer charges and vault charges, if any, and any and all other municipal or governmental assessments of any and every

nature levied or imposed upon the Property in respect of the current fiscal year of the applicable taxing authority in which the Closing Date occurs (the "Current Tax Year") on a per diem basis based upon the number of days in the Current Tax Year prior to the Closing Date (which shall be allocated to Seller) and the number of days in the Current Tax Year on and after the Closing Date (which shall be allocated to Purchaser). If the Closing shall occur before the tax rate for the Current Tax Year is fixed, the apportionment of real estate taxes shall be upon the basis of the tax rate for the next preceding fiscal period applied to the latest assessed valuation. Promptly after the new tax rate is fixed for the fiscal period in which the Closing takes place, the apportionment of real estate taxes shall be recomputed. Upon the Closing Date and subject to the adjustment provided above, Purchaser shall be responsible for real estate taxes and assessments levied or imposed upon the Property payable in respect of the Current Tax Year and all periods after the Current Tax Year. In no event shall Seller be charged with or be responsible for any increase in the real estate taxes or assessments levied or imposed upon the Property resulting from the transfer of the Property herein contemplated or from any improvements made or Leases entered into at any time or for any reason. In the event that any assessments levied or imposed upon the Property are payable in installments, the installment for the Current Tax Year shall be prorated in the manner set forth above and Purchaser hereby assumes the obligation to pay any such installments due on and after the Closing Date.

6.1.3    Charges and fees due under contracts for the supply to the Property of heat, steam, electric power, gas, light, and telephone, if any, in respect of the billing period of the related service provider in which the Closing Date occurs (the "Current Billing Period") on a per diem basis based upon the number of days in the Current Billing Period prior to the Closing Date (which shall be allocated to Seller) and the number of days in the Current Billing Period on and after the Closing Date (which shall be allocated to Purchaser) and assuming that all charges are incurred uniformly during the Current Billing Period (it being agreed that all deposits, if any, made by Seller as security under any such public service contracts shall be credited to Seller if such amounts remain on deposit after the Closing for the benefit of Purchaser; provided, however, that Seller shall be entitled in its sole discretion to receive a refund of such security deposits directly from any such service provider without credit to Purchaser).

6.1.4    Any charges or fees for transferable licenses and permits for the Property.

6.1.5    New York State Division of Housing and Community Renewal, Realty Advisory Board or Rent Stabilization Association dues and any registration or filing fees with any other governmental authority engaged in rent or housing regulation.

6.1.6    Any charges payable under any Service Contract on the basis of the period covered by such payments.

6.1.7    Wages, salaries and payroll benefits as to any employee at the Property.  Annexed hereto and made a part hereof as **Exhibit E** is a list of the present employees and the present compensation of such employees at the Property.

6.1.8    Fuel, if any, then stored at the Property on the basis of Seller's last cost therefor, including sales tax, as evidenced by a written statement of Seller's fuel oil supplier,

which statement shall be conclusive as to quantity and cost.

6.1.9 Administrative fees allowable by law on Tenant security deposits.

6.1.10 All other items customarily apportioned in connection with sales of multiple dwellings and commercial buildings in the State and City of New York.

6.2 If there are water meters on the Property, Seller shall obtain an actual title readings to a date not more than thirty (30) days prior to the Closing Date, and the unfixed meter charges and the unfixed sewer rents, if any, based thereon for the intervening time shall be equitably apportioned on the basis of such last readings. If Seller fails or is unable to obtain such readings, the Closing shall nevertheless proceed and the parties shall apportion the meter charges and sewer rents on the basis of the last readings and bills received by Seller and the same shall be appropriately readjusted after the Closing on the basis of the next subsequent bills, with an adequate escrow deposited with the Title company, so that said accrued charges will be insured against.

6.3 Seller shall not be required to assign any policies of insurance in respect of the Property to Purchaser and Purchaser shall be responsible for obtaining its own insurance as of the Closing Date. Purchaser shall take all necessary actions required to transfer all utility accounts to Purchaser as of the Closing Date.

The provisions of this Section 6 shall survive the Closing; provided, however, that any re-prorations or re-apportionments shall be made as and when required under Section 6.1 above.

7. Representations and Warranties of the Parties; Certain Covenants.

7.1 Seller warrants, represents and covenants to and with Purchaser that the following are true and correct on the date hereof:

7.1.1 Seller is a limited liability company duly formed and in good standing under the laws of the state of its organization or formation and has the requisite power and authority to enter into and to perform the terms of this Agreement. Seller is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Seller. This Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by Seller, when executed and delivered, shall constitute the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms (subject to bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally).

7.1.2 Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended, or any regulations promulgated thereunder (collectively, the "Code").

7.1.3 Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires

Seller to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Seller.

7.1.4     There are no judgments, orders, or decrees of any kind against Seller unpaid or unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or, to the best of Seller's actual knowledge, threatened against Seller, which would have any material adverse effect on the business or assets or the condition, financial or otherwise, of Seller or the ability of Seller to consummate the transactions contemplated by this Agreement.

7.1.5     Seller has not entered into any written Service Contracts relating to the Property which will be binding upon Purchaser after the Closing, except as set forth on **Exhibit C**. Nothing herein contained shall be deemed to be a guaranty, warranty or assurance that any Service Contracts will be in effect at the Closing, and the termination of any Service Contract prior to the Closing shall not affect Purchaser's obligations hereunder. Between the date hereof and the Closing, Seller shall neither materially modify any of the Service Contracts nor enter into any renewals, replacements, extensions or new contracts, agreements or licenses which are not on arm's length terms and cancelable on thirty (30) days' notice, without penalty.

7.1.6     Seller has not received written notice of any pending or threatened condemnation or eminent domain proceedings that would affect the Property.

The accuracy of the representations and warranties of Section 7.1 on the date hereof shall be conditions to Closing, but such representations and warranties shall not survive the Closing for a period in excess of six (6) months after Closing.

7.2     Purchaser warrants, represents and covenants to and with Seller that the following are true and correct on the date hereof:

7.2.1     Purchaser is a limited liability company duly organized or formed and in good standing under the laws of the state of its organization or formation and has the requisite power and authority to enter into and to perform the terms of this Agreement. Purchaser is not subject to any law, order, decree, restriction, or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Purchaser. This Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by Purchaser, when executed and delivered, shall constitute the legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its respective terms.

7.2.2     Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Purchaser to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Purchaser.

7.2.3 There are no judgments, orders, or decrees of any kind against Purchaser unpaid or unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, threatened against Purchaser, which would have any material adverse effect on the business or assets or the condition, financial or otherwise, of Purchaser or the ability of Purchaser to consummate the transactions contemplated by this Agreement.

7.3 Purchaser agrees and acknowledges that, except as specifically set forth in this Agreement, neither Seller, or any of its respective direct or indirect members, partners, shareholders, officers, directors, employees or agents (collectively, the "Seller Related Parties"), nor any agent nor any representative nor any purported agent or representative of Seller or any of the Seller Related Parties have made, and neither Seller nor any of the Seller Related Parties are liable for or bound in any manner by, any express or implied warranties, guaranties, promises, statements, inducements, representations or information pertaining to the Property or any part thereof. Without limiting the generality of the foregoing, Purchaser has not relied on any representations or warranties, and Seller, and the Seller Related Parties have not made any representations or warranties other than as expressly set forth herein, in either case express or implied, as to (a) the current or future real estate tax liabilities, assessments or valuations of the Property, (b) the potential qualification of the Property for any and all benefits conferred by Federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated, (c) the compliance of the Property, in its current or any future state, with applicable zoning ordinances and the ability to obtain a change in the zoning or a variance with respect to the Property's non-compliance, if any, with said zoning ordinances, (d) the availability of any financing for the alteration, rehabilitation or operation of the Property from any source, including, but not limited to, any state, city or Federal government or any institutional lender, (e) the current or future use of the Property, including but not limited to the Property's use for residential (including hotel, cooperative or condominium use) or commercial purposes, (f) the present and future condition and operating state of any and all machinery or equipment on the Property and the present or future structural and physical condition of any building or its suitability for rehabilitation or renovation, (g) the ownership or state of title of any personal property on the Property, (h) the presence or absence of any Laws and Regulations or any Violations, (i) the compliance of the Property or the Leases (or the rents thereunder) with any rent control or similar law or regulation, (j) the ability to relocate any Tenant or to terminate any Lease, and (k) the layout, leases, rents, income, expenses, operation, agreements, licenses, easements, instruments, documents or Service Contracts of or in any way affecting the Property. Further, Purchaser acknowledges and agrees that neither Seller nor any of the Seller Related Parties nor Broker are liable for or bound by (and Purchaser has not relied upon) any verbal or written statements, representations or any other information respecting the Property furnished by Seller, any of the Seller Related Parties or Broker or any broker, employee, agent, consultant or other person representing or purportedly representing Seller, any of the Seller Related Parties or Broker. The provisions of this Section 7.3 shall survive the Closing.

7.4 Purchaser acknowledges and agrees that, prior to entering into this Agreement, Purchaser has (i) been given adequate opportunity, to review the Leases (hereinafter defined), operating statements, tenant files, building files, collection reports, arrears reports, litigation schedules, DHCR reports and all other matters which are deemed material to Purchaser

and (ii) made such examination of the Property, the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary. Purchaser is accepting the Property "as is", "where is", with all faults, and without any representations or warranties whatsoever, other than as expressly set forth herein. This Section 7.4 shall survive Closing.

      8.    <u>Closing Deliveries.</u>

      8.1    At or prior to the Closing, Seller shall make, have made or caused to be made, the following deliveries:

      8.1.1    Seller shall execute, acknowledge and deliver to Purchaser a bargain and sale deed with covenants against grantor's acts, sufficient to convey fee title to the Property subject to and in accordance with the provisions of this Agreement, in the form attached hereto as **Exhibit F** and made a part hereof (the "<u>Deed</u>").

      8.1.2    Seller shall execute, acknowledge and deliver to Purchaser an assignment of all of Seller's right, title and interest as landlord or otherwise under each of the Leases in respect of the Property, and of any security deposits actually held by Seller on the date of the Closing, in the form attached hereto as **Exhibit G** and made a part hereof (the "<u>Assignment of Leases</u>") and shall deliver to Purchaser executed originals or copies of each of such Leases in Seller's possession.

      8.1.3    Seller shall execute and deliver to Purchaser notices to the Tenants under the Leases advising them of the sale of the Property.

      8.1.4    Seller shall execute, acknowledge and deliver to Purchaser an assignment of all of Seller's right, title and interest in and to the Service Contracts set forth on **Exhibit C** and all other Service Contracts entered into after the date hereof, to the extent permitted pursuant to this Agreement, in the form attached hereto as **Exhibit H** and made a part hereof (the "<u>Assignment of Service Contracts</u>"). Seller shall deliver Seller's original counterparts or copies (if Seller does not have originals in its possession), certified to be true, correct and complete, of all such Service Contracts.

      8.1.5    Seller shall execute, acknowledge and deliver to Purchaser a bill of sale, conveying and transferring to Purchaser all right, title and interest of Seller, if any, in and to all fixtures, machinery, equipment, articles of personal property and improvements in the nature of personal property attached or appurtenant to, or located on, or used in connection with the use or operation of, or used or adapted for use in connection with the enjoyment or occupancy of the Property, including, without limitation, all assignable (without third party consent(s)) licenses, permits, warranties and guarantees and plans and specifications held by Seller in connection with the Property, specifically excluding, however, any personal property of Tenants (the "<u>Bill of Sale</u>") in the form attached hereto as **Exhibit I** and made a part hereof.

      8.1.6    Seller shall deliver to Purchaser all keys to any portion of the Property, to the extent in Seller's possession or control, properly marked and labelled.

      8.1.7    Seller shall deliver to Purchaser a certificate, duly executed and

acknowledged by Seller, in accordance with Section 1445 of the Code.

8.1.8    Seller shall deliver to the Title Company a limited liability company resolution of Seller authorizing the transaction contemplated herein and the execution and delivery of the documents required to be executed and delivered hereunder.

8.1.9    Seller shall execute, acknowledge and deliver a Combined Real Estate Transfer Tax Return and Credit Line Mortgage Certificate, Form TP-584 in respect of the Property (the "State Transfer Tax Return").

8.1.10   Seller shall execute, acknowledge and deliver a New York City Department of Finance Real Property Transfer Tax Return in respect of the Property (the "City Transfer Tax Return").

8.1.11   Seller shall execute, acknowledge and deliver Form RP-5217 in respect of the Property (the "Equalization Form").

8.1.12   Seller shall deliver to Purchaser to the extent in Seller's possession, original leases (or if not available, copies of all the Leases) together with all other lease files in Seller's or its agents' possession. Seller shall endeavor to obtain and deliver to Purchaser prior to Closing from the commercial Tenants at the Property a tenant estoppels, in form satisfactory to Purchaser's lender. In the event Seller is unable to obtain a tenant estoppel from said commercial Tenants, Seller shall provide a landlord estoppel, inform satisfactory to Purchaser's lender.

8.1.13   Seller shall execute and deliver the Registration Statement required by the Department of Housing Preservation and Development, Smoke Detector Affidavit, and such other documents required to be delivered in connection with the transfer of a multiple dwelling.

8.2    Seller shall deliver to the Title Company checks for the payment of Transfer taxes due pursuant to the State Transfer Tax Returns and the City Transfer Tax Return, if any taxes are required to be paid.

8.3    At or prior to the Closing, Purchaser or its agents shall make, have made or caused to be made, the following deliveries:

8.3.1    Purchaser shall pay to Seller the balance of the Purchase Price required pursuant to Section 3.2.2 hereof.
8.3.2    Purchaser shall deliver to Seller a resolution of Purchaser's members required under its operating or similar agreement authorizing the transaction contemplated herein and the execution and delivery of the documents required to be executed and delivered hereunder.

8.3.3    Purchaser shall execute, acknowledge and deliver to Seller a counterpart of the Assignment of Leases.

8.3.4   Purchaser shall execute, acknowledge and deliver to Seller a counterpart of the Assignment of Service Contracts.

8.3.5   Purchaser shall execute, acknowledge and deliver to Seller a counterpart of the State Transfer Tax Return.

8.3.6   Purchaser shall execute, acknowledge and deliver to Seller a counterpart of the City Transfer Tax Return.

8.3.7   Purchaser shall execute, acknowledge and deliver to Seller a counterpart of the Equalization Form.

8.3.8   Purchaser shall acknowledge receipt of copies of the Leases delivered by Seller.

8.4   Seller and Purchaser, at the Closing, shall prepare, execute and deliver to each other, subject to all the terms and provisions of this Agreement, (a) a closing statement setting forth, inter alia, the closing adjustments and material monetary terms of the transaction contemplated hereby and (b) such other instruments and documents as may be reasonably required to effectuate the consummation of the transactions described in this Agreement.

9.   Interim Responsibilities.
9.1   Seller agrees that during the period between the date hereof and the Closing Date:

9.1.1   Seller will manage and lease the Property or will cause the Property to be managed and leased under policies substantially similar to those existing prior to the date hereof, provided that Seller shall have no obligation to make any capital improvements or replacements to the Property or any portion thereof.

9.1.2   Without limiting Section 9.1.1, Seller may modify, extend or terminate the Lease of any Tenant that is in default in its obligations pursuant to its Lease subject to Purchaser's approval.

9.1.3   Seller shall not permit occupancy of or enter into any new Lease for space which is presently vacant or which may hereafter become vacant

9.1.4   Seller shall not enter into the renewal, extension or modification of any Lease, other than renewals to the extent required by the New York Rent Control or Rent Stabilization laws at, as applicable, the maximum legal rent or at market rent (it being acknowledged that such rents may be less than the maximum legal rents pursuant to the Rent Guidelines Board). Purchaser acknowledges that the residential units contained in the Property may be subject to certain rights of renewal pursuant to the New York Rent Control and Rent Stabilization laws and, as a result, Seller may, without Purchaser's consent, deliver renewal notices to Tenants under Leases and execute renewal agreements with respect to Leases in accordance with the Rent Guidelines Board maximum increases then in effect.

9.1.5   Seller will maintain property and liability insurance coverage in the ordinary course of Seller's business with respect to the Property from the date hereof through the Closing Date or earlier termination of this Agreement.

9.1.6   Seller will not grant any lien or cause any instrument to be recorded that would further encumber the Property in any manner, other than memoranda of lease and/or subordination, non-disturbance and attornment agreements with respect to Leases entered into in accordance with the terms hereof or liens or encumbrances to be discharged as of the Closing Date.

9.2     Intentionally Omitted.

9.3     Between the date hereof and the Closing Date, Purchaser shall be afforded access to the Property required by Purchaser in connection with its preparation for the Closing. Purchaser agrees that in entering upon and inspecting or examining the Property, it will not communicate with the Tenants, any employees or any service providers without the prior written consent of the Seller to be given or withheld in the Seller's sole and absolute discretion.  Any access to the Property required by Purchaser in connection with the inspection of the Property contemplated hereunder shall be subject to the following terms and conditions (i) must be upon written notice to Seller and during reasonable business hours, (ii) at all times Purchaser and its representatives shall be accompanied by a representative of Seller when at the Property and (iii) prior to any entry, Purchaser shall deliver to Seller proof of the insurance listed below in the form of a certificate of insurance.  Purchaser agrees to carry, or to require its authorized agents who access the Property to carry, (i) a policy of commercial general liability insurance with a minimum limit of One Million Dollars ($1,000,000.00) for each occurrence and Three Million Dollars ($3,000,000.00) in the aggregate for bodily injury and property damage; and (ii) a workman's compensation or employer's liability insurance policy in accordance with the laws of the State of New York.  The insurance shall be (a) issued by an insurance company or companies with a rating of no less than A-VIII in the then current Best's Insurance Guide, or that is otherwise acceptable to Seller in its discretion, and that are admitted to engage in the business of insurance in the State of New York, and (b) name Seller and its agents by endorsement as an additional insured under Purchaser's general liability coverage. Purchaser agrees that its inspection activities shall not unreasonably interfere with the operation of the Property or with any Tenants and Purchaser shall repair any and all damage caused to the Property arising or resulting from such inspection.  Seller does not warrant that Purchaser shall be afforded access to tenanted areas.

9.3.1   Notwithstanding anything to the contrary contained in this Section 9.3, Purchaser shall not and shall not permit its employees, consultants, engineers and agents to conduct any soil test or sampling, boring, digging or any other physical intrusion of the Property and/or the Improvements (collectively, "Testing") without the prior written consent of the applicable Seller to be given or withheld in such Seller's sole and absolute discretion.

9.3.2   Purchaser hereby indemnifies, defends and holds harmless Seller and Seller Related Parties (as hereinafter defined) from any and all claims, damages, liability, loss, cost and expense (including, without limitation, reasonable attorney's fees and disbursements) arising out of the acts of Purchaser, its representatives, partners, shareholders,

agents, employees, licensees, invitees, contractors and consultants in connection with any inspection and/or Testing conducted at the Property.

10.  Limitation on Liability of Parties.
     10.1  In the event Purchaser shall default in the performance of Purchaser's obligations under this Agreement and the Closing does not occur as a result thereof (a "Purchaser Default"), Seller shall be entitled to retain the Downpayment and any interest earned thereon as and for full and complete liquidated and agreed damages for Purchaser's default, and thereupon Purchaser shall be released from any further liability to Seller hereunder, except for those provisions hereof intended to survive the termination of this Agreement. SELLER AND PURCHASER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER UPON A PURCHASER DEFAULT AND THAT THE DOWNPAYMENT AND ANY INTEREST EARNED THEREON, AS THE CASE MAY BE, REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON A PURCHASER DEFAULT. SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE MEANING OF APPLICABLE LAW.

     10.2  Subject to the provisions of Section 2.3 hereof, in the event that Seller shall default in the performance of Seller's obligations under this Agreement and the Closing does not occur as a direct result thereof, Purchaser shall be entitled, to either (a) instruct Escrow Agent to pay to Purchaser the Downpayment with the interest earned thereon, if any, (a "Downpayment Return"), upon which Seller shall be released from any further liability to Purchaser hereunder for any other damages of any kind whatsoever, except for the provisions hereof intended to survive the termination of this Agreement, or (b) seek specific performance of Seller's obligations hereunder; but in no event whatsoever shall Seller be obligated to pay Purchaser damages of any kind or nature.

11.  Fire or Other Casualty, Condemnation.
     11.1  If, prior to the Closing, there shall occur (a) damage to the Property caused by fire or other casualty which would cost an amount equal to ten (10%) percent of the Purchase Price or more to repair, as reasonably determined by an engineer selected by Seller which is reasonably satisfactory to Purchaser, or (b) a taking by condemnation of any material portion of the Property, then, and in either such event, Purchaser may elect to terminate this Agreement by written notice given to Seller within ten (10) days after the date of the casualty, in which event Seller shall promptly instruct Escrow Agent, to make a Downpayment Return, this Agreement shall thereupon be null and void and neither party hereto shall thereupon have any further obligation to the other, except for the provisions hereof intended to survive the termination of this Agreement.  If Purchaser does not elect to terminate this Agreement, then the Closing shall take place as herein provided, without abatement of the Purchase Price, and Seller shall assign to Purchaser at the Closing, by written instrument, all of Seller's interest in and to any insurance proceeds or condemnation awards which may be payable to Seller on account of any such fire, casualty or condemnation, shall deliver to Purchaser any such proceeds or awards actually theretofore paid, less any amounts (the "Reimbursable Amounts") (i) actually and reasonably expended or incurred by Seller in adjusting any insurance claim or negotiating and/or obtaining any condemnation award (including, without limitation, reasonable attorneys' fees and expenses)

and/or (ii) theretofore actually and reasonably incurred or expended by or for the account of Seller for the cost of any compliance with laws, protective restoration or emergency repairs made by or on behalf of Seller. The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Seller.

   11.2 If, prior to the Closing, there shall be (a) damage to the Property caused by fire or other casualty which would cost less than ten (10%) percent of the Purchase Price to repair, as reasonably determined by an engineer selected by Seller which is reasonably satisfactory to Purchaser, or (b) a taking by condemnation of any part of the Property which is not material, then, and in either such event, neither party shall have the right to terminate its obligations under this Agreement by reason thereof, but Seller shall assign to Purchaser at the Closing, by written instrument, all of Seller's interest in any insurance proceeds or condemnation awards which may be payable to Seller on account of any such fire, casualty or condemnation, or shall deliver to Purchaser any such proceeds or awards actually theretofore paid, in each case less any Reimbursable Amounts, and Seller shall pay to Purchaser the amount of the deductible, if any, under Seller's property insurance policy(ies), less all Reimbursable Amounts not received by Seller from any insurance proceeds or condemnation awards paid to Seller prior to the Closing. The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Seller.

   11.3 Nothing contained in this Section 11 shall be construed to impose upon Seller any obligation to repair any damage or destruction caused by fire or other casualty or condemnation.

   11.4 For purposes of this Section 11, a taking by condemnation or eminent domain of a material part of the Property shall mean any taking which leaves remaining a balance of Property which may not be economically operated (after appropriate restoration) for the purpose for which the Property was operated prior to such taking.

   11.5 In the event Purchaser elects not to terminate this Agreement in accordance with Section 11.1 above, or upon the occurrence of the events set forth in Section 11.2 (a) or (b) above, Seller shall have the exclusive right to negotiate, compromise or contest the obtaining of any insurance proceeds and/or any condemnation awards.

   11.6 Seller shall maintain an insurance policy with a $3,000,000.00 building limit on the Property to the date of Closing.

  12. <u>Brokerage.</u>
   Purchaser and Seller each represent and warrant that it has not dealt with any broker, consultant, finder or like agent who might be entitled to a commission or compensation on account of introducing the parties hereto, the negotiation or execution of this Agreement or the closing of the transactions contemplated. Purchaser and Seller agree to indemnify and hold each other and the Related Parties of the other harmless from and against all claims, losses, liabilities and expenses (including, without limitation, reasonable attorney's fees and disbursements) which may be asserted against, imposed upon or incurred by such party by reason of any claim made by any other broker, consultant, finder or like agent for commissions or other compensation for bringing about this transaction or claiming to have introduced the

Property to Purchaser. The provisions of this Section 12 shall survive the Closing or the termination of this Agreement.

13.    Closings Costs; Fees and Disbursements of Counsel.

At the Closing, Seller shall pay the New York State Real Estate Transfer Tax imposed pursuant to Article 31 and Section 1402 of the New York Tax Law (the "State Transfer Tax") and the New York City Real Property Transfer Tax imposed pursuant to Title 11, Chapter 21 of the New York City Administrative Code (the "City Transfer Tax") upon or payable in connection with the transfer of title to the Property and the recordation of the Deed, which State Transfer Tax and City Transfer Tax shall, at Seller's election, be allowed for out of the Purchase Price and paid by Purchaser on behalf of Seller. Seller and Purchaser shall each execute and/or swear to the returns or statements required in connection with the State Transfer Tax and the City Transfer Tax. All such tax payments shall be made payable directly to the order of the appropriate governmental officer or the Title Company. Except as otherwise expressly provided to the contrary in this Agreement, Purchaser shall pay (a) all charges for recording and/or filing the Deed and (b) all title charges and survey costs, including the premium on Purchaser's Title Policy. Each of the parties hereto shall bear and pay the fees and disbursements of its own counsel, accountants and other advisors in connection with the negotiation and preparation of this Agreement and the Closing. The provisions of this Section 13 shall survive the Closing.

14.    Notices.

Except as otherwise provided in this Agreement, all notices, demands, requests, consents, approvals or other communications (for the purposes of this Section collectively referred to as "Notices") required or permitted to be given hereunder or which are given with respect to this Agreement, in order to constitute effective notice to the other party, shall be in writing and shall be deemed to have been given when (a) personally delivered with signed delivery receipt obtained, (b) when transmitted by e-mail, if followed by giving of, pursuant to one of the other means set forth in this Section 14 before the end of the first business day thereafter, confirmation of successful transmission to the appropriate e-mail address of the address listed below as obtained by the sender from the sender's e-mail address, or (c) upon receipt, when sent by prepaid reputable overnight courier, in each case addressed as follows:

If to Seller:

E. 9TH ST. HOLDINGS LLC
c/o FIA Capital Partners LLC
7280 West Palmetto Park Road
Suite 203-N
Boca Raton, Florida 33433
Attn: David Goldwasser
Email: dgoldwasser@fiacp.com

with a copy to:

        Goldberg Rimberg & Weg PLLC
        115 Broadway, Suite 302
        New York, New York 10006
        Attn: Sarah Benji, Esq.
        E-mail: sbenji@grlawpllc.com

If to Purchaser:

        332 EAST 9TH LLC
        1946 Coney Island Avenue
        Brooklyn, New York 11223
        Attn:  Sam Kairy
        Email: sam@renrealty.com

with a copy to:

        Kordas & Marinis
        544 47th Avenue
        Long Island City, New York 11101
        Attn: Nicholas Kordas
        Email: Nicholas.kordas@kandmlaw.com

If to Escrow Agent, to:

        Goldberg Rimberg & Weg PLLC
        115 Broadway, Suite 302
        New York, New York 10006
        Attn: Robert Rimberg, Esq.
        E-mail: rlr@grlawpllc.com

Notices shall be valid only if served in the manner provided above. Notices may be sent by the attorneys for the respective parties and each such Notice so served shall have the same force and effect as if sent by such party.

    15.    <u>Survival; Governing Law.</u>
        Except as otherwise expressly set forth in this Agreement, the provisions of this Agreement shall not survive the Closing provided for herein. This Agreement shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of New York.

    16.    <u>Counterparts; Captions.</u>
        This Agreement may be executed in counterparts, each of which shall be deemed an original. The captions are for convenience of reference only and shall not affect the construction to be given any of the provisions hereof. The parties may sign this Agreement by Portable Document Format ("<u>PDF</u>"), by telefaxed copies or by e-mail to the other party or its

counsel, and any such PDF, telefaxed or e-mailed copy shall be deemed to be an original and are binding on the parties so signing, and no objection shall be made to the introduction into evidence of any PDF, telefaxed or e-mailed copy on grounds related to the PDF, telefaxed or e-mailed copy not being an original.

17. <u>Entire Agreement; No Third Party Beneficiaries.</u>
This Agreement (including all exhibits annexed hereto), contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings, if any, with respect thereto. This Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged or by its agent duly authorized in writing or as otherwise expressly permitted herein. The parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto. The provisions of this Section 17 shall survive the Closing.

18. <u>Waivers; Extensions.</u>
No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

19. <u>No Recording.</u>
The parties hereto agree that neither this Agreement nor any memorandum or notice hereof shall be recorded. Any recordation or attempted recordation by Purchaser shall constitute a Purchaser's Default.

20. <u>Assignment.</u>
Purchaser shall neither assign its rights nor delegate its obligations hereunder without obtaining Seller's prior written consent, which consent may be granted or withheld in Seller's reasonable discretion, except for an assignment to a related entity which is directly or indirectly managed by Sam Kairy or Marc Shemtov. In connection with any assignment permitted or consented to hereunder, such assignee shall assume in writing all of the assignor's obligations under this Agreement in form and substance satisfactory to Seller, provided that Purchaser originally named herein shall not be relieved from its obligations under this Agreement. Any other purported or attempted assignment or delegation without obtaining Seller's prior written consent or not otherwise permitted hereunder shall be void and of no effect. Any change in control of Purchaser or of any of the direct or indirect ownership interests in Purchaser, at any level or tier of ownership, whether in one transaction or a series of transactions, shall constitute an assignment for purposes of this Section 20. No consent given by Seller to any transfer or assignment of Purchaser's rights or obligations hereunder shall be construed as a consent to any other transfer or assignment of Purchaser's rights or obligations hereunder. Purchaser shall not resell the Property or any part thereof through a "double escrow" or other similar procedure without Seller's prior written consent, which consent may be granted or withheld in Seller's sole discretion. No transfer or assignment in violation of the provisions hereof shall be valid or enforceable.

21.    Pronouns, Joint and Several Liability.
        All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the parties may require. If Purchaser consists of two or more parties, the liability of such parties shall be joint and several.

22.    Successors and Assigns.
        This Agreement shall bind and inure to the benefit of Seller, Purchaser and their respective permitted successors and permitted assigns.

23.    Escrow.
        23.1    Upon receipt by Escrow Agent of the Downpayment, provided that a completed and signed Request for Taxpayer Identification Number and Certification (Form W-9) and any other documentation required in connection with the placement of the Downpayment in an interest bearing account are provided to Escrow Agent, Escrow Agent shall cause the Downpayment to be deposited into an interest bearing account at JPMorgan Chase Bank (the "Escrow Account") (it being agreed that Escrow Agent shall not be liable for the amount of interest which accrues thereon, if any). Any interest earned on the Downpayment shall be deemed to be part of the Downpayment and shall be delivered by Escrow Agent to the party entitled to receive the Downpayment at Closing or upon termination of this Agreement in accordance with the terms hereof. The party receiving the Downpayment shall pay any income taxes payable thereon.

        23.2    Escrow Agent shall acknowledge receipt of the Downpayment and agrees to hold the Downpayment in the Escrow Account pursuant to the provisions of this Agreement for application in accordance with the provisions hereof, upon the following terms:

        23.2.1  Escrow Agent shall have no duties or responsibilities other than those expressly set forth herein. Escrow Agent shall have no duty to enforce any obligation of any person to make any payment or delivery or to enforce any obligation of any person to perform any other act. Escrow Agent shall be under no liability to the other parties hereto or to anyone else by reason of any failure on the part of any party hereto or any maker, guarantor, endorser or other signatory of any document or any other person to perform such person's obligations under any such document. Except for amendments to this Agreement expressly approved by Escrow Agent and except for joint instructions given to Escrow Agent by Seller and Purchaser relating to the Downpayment, Escrow Agent shall not be obligated to recognize any agreement between any or all of the persons referred to herein, notwithstanding that references thereto may be made herein and whether or not it has knowledge thereof.

        23.2.2  In its capacity as Escrow Agent, Escrow Agent shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it and shall have no responsibility other than to faithfully follow the instructions contained herein, and it is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and reasonably believed by Escrow Agent to have been signed by the proper person. Escrow Agent may assume that any person purporting to give any notice hereunder has been duly authorized to do so. Escrow Agent is acting as a stakeholder only with respect to the Downpayment. Promptly after the receipt by Escrow Agent

of (a) notice of any demand by either party claiming that it is entitled to the Downpayment or (b) any other claim or the commencement of any action, suit or proceeding by either party, Escrow Agent shall, if a claim in respect thereof is to be made against any of the other parties hereto, send a copy of such notice to the other party and inform the other party of such claim; but the failure by Escrow Agent to give such notice shall not relieve any party from any liability which such party may have to Escrow Agent hereunder. If Escrow Agent shall receive written notice from either party within ten (10) Business Days after delivery of such notice instructing Escrow Agent to not deliver the Downpayment to the other party or to otherwise hold the Downpayment, or if for any reason there is any dispute or uncertainty concerning any action to be taken hereunder, Escrow Agent shall take no action and shall continue to hold the Downpayment until it has received instructions in writing concurred to by Seller and Purchaser or until directed by a final order of judgment of a court of competent jurisdiction, whereupon Escrow Agent shall take such action in accordance with such instructions or such order.

        23.2.3 It is understood and agreed that the duties of Escrow Agent are purely ministerial in nature and Escrow Agent is acting hereunder without charge as an accommodation to Purchaser and Seller. Escrow Agent shall not be liable to the other parties hereto or to anyone else for any action taken or omitted by it, or any action suffered by it to be taken or omitted, in good faith and in the exercise of reasonable judgment, except for acts of willful misconduct or gross negligence. Escrow Agent may rely conclusively and shall be protected in acting upon any order, notice, demand, certificate, opinion or advice of counsel (including counsel chosen by Escrow Agent), statement, instrument, report or other paper or document (not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability of any information therein contained) which is believed by Escrow Agent to be genuine and to be signed or presented by the proper person or persons. Escrow Agent shall not be bound by any notice or demand, or any waiver, modification, termination or rescission of this Agreement or any of the terms hereof, unless evidenced by a final judgment or decree of a court of competent jurisdiction in the State of New York, or a Federal court in such jurisdiction or a writing delivered to Escrow Agent signed by the proper party or parties and, if the duties or rights of Escrow Agent are affected, unless it shall give its prior written consent thereto.

        23.2.4 Escrow Agent shall have the right to assume in the absence of written notice to the contrary from the proper person or persons that a fact or an event by reason of which an action would or might be taken by Escrow Agent does not exist or has not occurred, without incurring liability to the other parties hereto or to anyone else for any action taken or omitted, or any action suffered by it to be taken or omitted, in good faith and in the exercise of reasonable judgment, in reliance upon such assumption.

        23.2.5 Except in connection with Escrow Agent's willful misconduct or gross negligence, Escrow Agent shall be indemnified and held harmless jointly and severally by the other parties hereto from and against any and all expenses or loss suffered by Escrow Agent (as Escrow Agent), including reasonable attorneys' fees, in connection with any action, suit or other proceeding involving any claim, which arises out of or relates to this Agreement, the services of Escrow Agent hereunder or the monies held by it hereunder.

23.2.6 From time to time on and after the date hereof, Seller and Purchaser shall deliver or cause to be delivered to Escrow Agent such further documents and instruments and shall do and cause to be done such further acts as Escrow Agent shall reasonably request (it being understood that Escrow Agent shall have no obligation to make any such request), to evidence compliance herewith or to assure itself that it is protected in acting hereunder.

23.2.7 Escrow Agent may resign at any time as Escrow Agent hereunder upon giving five (5) days' prior written notice to that effect to both Seller and Purchaser. In such event, the successor Escrow Agent shall be the Title Company or a nationally recognized title insurance company or other person acceptable to both Seller and Purchaser. Such party that will no longer be serving as Escrow Agent shall deliver, against receipt, to such successor Escrow Agent, the Downpayment held by such party, to be held by such successor Escrow Agent pursuant to the terms and provisions of this Agreement. If no such successor has been designated on or before such party ceases to be Escrow Agent hereunder, whether by resignation or otherwise, its obligations as Escrow Agent shall continue until such successor is appointed, provided, however, its sole obligation thereafter shall be to safely keep all monies then held by it and to deliver the same to the person, firm or corporation designated as its successor or until directed by a final order or judgment of a court of competent jurisdiction, whereupon Escrow Agent shall make disposition thereof in accordance with such order; provided further, however, that such Escrow Agent, in such event, shall deliver the Downpayment against receipt, to any bank or trust company or title insurance company operating in New York City selected by such party. If no successor Escrow Agent is designated and qualified within five (5) days after its resignation is effective, such party that will no longer be serving as Escrow Agent may apply to any court of competent jurisdiction for the appointment of a successor Escrow Agent. Further, Notwithstanding anything contained in this Section 23 to the contrary, if Escrow Agent shall have received a notice of objection as provided for in Section 23.2.2 above within the time therein prescribed, or shall have received at any time before actual disbursement of the Downpayment a written notice signed by either Seller or Purchaser disputing entitlement to the Downpayment or shall otherwise believe in good faith at any time that a disagreement or dispute has arisen between the parties hereto over entitlement to the Downpayment (whether or not litigation has been instituted), Escrow Agent shall have the right, upon written notice to both Seller and Purchaser, (a) to deposit the Downpayment, together with the interest earned thereon with the Clerk of the Court in which any litigation is pending and/or (b) to take such reasonable affirmative steps as it may, at its option, elect in order to terminate its duties as Escrow Agent, including, without limitation, the depositing of the Downpayment, together with the interest earned thereon, with a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be borne by whichever of Seller or Purchaser is the losing party, and thereupon Escrow Agent shall be released of and from all liability hereunder except for any previous gross negligence or willful misconduct.

23.2.8 Purchaser acknowledges that Escrow Agent is counsel to Seller and expressly waives any conflicts or claims related thereto. Further, in any litigation or dispute between the parties Escrow Agent shall be permitted to represent Seller in connection with same.

24.    Tax Proceedings.

From and after the date hereof until the Closing, Seller is hereby authorized to commence any new proceeding or proceedings and/or continue any proceeding or proceedings now pending for the reduction of the assessed valuation of the Property, and in Seller's sole discretion at its sole cost and expense to litigate or settle same; provided, however, that Purchaser shall be entitled to that portion of any refund relating to the period occurring after the Closing after payment to Seller of all costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, incurred by Seller in obtaining such refund. Purchaser shall deliver to Seller, reasonably promptly after request therefor, receipted tax bills and canceled checks used in payment of such taxes and shall execute any and all consents or other documents, and do any act or thing necessary for the collection of such refund by Seller. Any refunds or credits due for the periods prior to Purchaser's ownership of the Property shall remain the sole property of Seller. The provisions of this Section 24 shall survive the Closing.

25.    Confidentiality.

Purchaser covenants and agrees not to communicate the terms or any aspect of this Agreement and the transactions contemplated hereby to any person or entity and to hold, in the strictest confidence, the content of any and all information in respect of the Property which is supplied by Seller to Purchaser, without the express written consent of Seller; provided, however, that Purchaser may, without consent, disclose the terms hereof and the transactions contemplated hereby (a) to its respective advisors, consultants, attorneys, accountants, and lenders (the "Transaction Parties") without the express written consent of Seller, so long as any such Transaction Parties to whom disclosure is made shall also agree to keep all such information confidential in accordance with the terms hereof and (b) if disclosure is required by law or by regulatory or judicial process, provided that in such event Purchaser shall notify Seller in writing of such required disclosure, shall exercise all commercially reasonable efforts to preserve the confidentiality of the confidential documents or information, as the case may be, including, without limitation, reasonably cooperating with Seller to obtain an appropriate order or other reliable assurance that confidential treatment will be accorded such confidential documents or information, as the case may be, by such tribunal and shall disclose only that portion of the confidential documents or information which it is legally required to disclose. If this Agreement is terminated, such confidentiality shall be maintained and Purchaser and the Transaction Parties will destroy or deliver to Seller, upon request, all documents and other materials, and all copies thereof, obtained thereby in connection with this Agreement that are subject to such confidence, with any such destruction confirmed by Purchaser and the Transaction Parties in writing. The foregoing confidentiality obligations shall not apply to the extent that any such information is a matter of public record or is provided in other sources readily available to the real estate industry other than as a result of disclosure by Purchaser or the Transaction Parties. Purchaser hereby indemnifies Seller against, and holds Seller harmless from, any and all claims, losses, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees and disbursements) arising in connection with Purchaser's obligations under this Section 25. The provisions of this Section 25 shall survive the termination of this Agreement.

26.    Accelerated Dispute Resolution.  Subject to the requirements for a case to be heard in the Commercial Division, the parties agree to submit to the exclusive jurisdiction of the Commercial Division, New York State Supreme Court, and to the application of the court's

accelerated procedures, in connection with any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement or validity thereof.

    27.    <u>Additional Provisions.</u>

    27.1    At Purchaser's option, Seller shall request the holders of the existing mortgages to assign their mortgages to Purchaser's lender. If the holders of the existing mortgages agree to such assignments, Purchaser shall pay the costs and expenses of the holders' counsel in connection with the preparation of the assignment of the existing mortgages and the attendance at the Closing.

    27.2    Purchaser acknowledges that Seller is disposing of the Property as part of an IRC Section 1031 Tax Deferred Exchange for Seller's benefit. Purchaser agrees to assist and cooperate in such exchange for the benefit of Seller provided Purchaser shall incur no liability, cost or expense and will execute any and all documents, subject to the reasonable approval of its counsel, as are reasonably necessary in connection with such exchange, including but not limited to taking title to and conveying title to any other property designated by Seller as part of such exchange.

    27.3    For the purposes of this Agreement, the capitalized term "<u>Business Day(s)</u>" means any day of the year except Saturdays, Sundays and national holidays on which banks are required by law to close in New York City.

    27.4    Seller represents as follows:

(a)    Seller has not transferred nor agreed to transfer any development nor air rights or rights of way pertaining to the Premises, nor does it have any knowledge of such transfer or agreement to transfer the same. Seller has not granted any transmission rights or rights to place antenna or other relay equipment on the Premises. The representations, warranties and provisions of this paragraph shall survive Closing.

(b)    No person, firm or corporation or other entity has any right, or option to acquire the subject premises or any portion thereof or any interest therein. The representations, warranties and provisions of this paragraph shall survive Closing.

    27.5    Seller shall deliver apartments 1, 5, 14, 16, 18 and 20 (the "<u>Free Market Apartments</u>") vacant at Closing. In the event Seller is unable to deliver the Free Market Apartments vacant, Seller shall deposit with Escrow Agent $66,666.66 per each un-vacant apartment (the "<u>Free Market Escrow</u>") to facilitate Purchaser's ability to obtain vacant possession of the Free Market Apartments. In the event Purchaser is unsuccessful in resolving such issues or vacating the Free Market Apartments, by September 1, 2018, each Free Market Escrow shall be released to Purchaser.

    27.6    Purchaser acknowledges and agrees that they will not receive a credit at Closing for prepaid rents received to the date hereof for apartments 1, 5, 16, 18, 20, and The Green Garden Restaurant LLC which were paid as per their respective leases.

27.7    An entity related to Purchaser shall be designated by Seller to manage the Property as soon as practicable pursuant to an agreed upon management agreement.

27.8    Purchaser acknowledges that it will reimburse and/or pay for apartment 17's surrender. Any amounts advanced will be a lien against the Property in the event Purchase the Property, in the event Purchaser does purchase the Property no adjustment shall be made to Purchaser.

[SIGNATURES ON THE FOLLOWING PAGE]

**IN WITNESS WHEREOF,** the parties have duly executed this Agreement as of the day and year first above written.

SELLER:
**E. 9TH ST. HOLDINGS LLC**

By: _____
Name: David Goldwasser
Title:   Authorized Signatory


PURCHASER:

332 East 9th LLC

By: _____
Name: Sam Kairy
Title:   MEMBER


**ESCROW AGENT:**

SOLELY FOR THE PURPOSES OF CONFIRMING
THE PROVISIONS OF ARTICLE 23:

GOLDBERG RIMBERG & WEG PLLC

By: _____
Name: Robert Rimberg, Esq.
Title:   Member

## SCHEDULE OF EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description |
| Exhibit B | Leases (Rent Roll) |
| Exhibit B-1 | Security Deposits |
| Exhibit C | Service Contracts |
| Exhibit D | Additional Permitted Exceptions |
| Exhibit E | Employees and Compensation |
| Exhibit F | Bargain and Sale (Without Covenants) Deed |
| Exhibit G | Assignment of Leases |
| Exhibit H | Assignment of Service Contracts |
| Exhibit I | Bill of Sale |

# EXHIBIT A

## LEGAL DESCRIPTION

# SCHEDULE A CONTINUED

## LEGAL DESCRIPTION

All that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, in the 17th Ward, known and designated on a certain map entitled, "Map showing a division of part of the Real Estate of Nicholas W. Stuyvesant, deceased, among his heirs, situated in the 11th Ward, New York City", filed in the Register's Office, New York City on April 24, 1835 as Lot 145 on the southerly side of East 9th Street between 1st and 2nd Avenue, bounded and described as follows:

BEGINNING at a point on the southerly side of East 9th Street, distant 325 feet easterly from the southeasterly corner of 2nd Avenue and East 9th Street;

RUNNING THENCE southerly on a line parallel with 2nd Avenue, 93 feet 11 inches to the center line of the block;

THENCE easterly along the center line of the block and parallel with East 9th Street, 25 feet;

THENCE northerly on a line parallel with 2nd Avenue and part of the distance through a party wall, 93 feet 11 inches to the southerly side of East 9th Street;

THENCE westerly along the southerly side of East 9th Street, 25 feet to the point or place of BEGINNING.

NOTE:  Being  Block(s) 450, Lot(s) 20, Tax Map of the Borough of Manhattan, County of New York.

NOTE:  Lot and Block shown for informational purposes only.

Issued by:
**Madison Title Agency, LLC**
**1125 Ocean Avenue, Lakewood, NJ 08701**
**Telephone: (732)905-9400  Fax: (732)905-9420**

# EXHIBIT B

## LEASES (RENT ROLL)

# Rent Roll

332 East 9th Street (332e9)

As of: 06/15/2017

**Current/Notice Residents**

| Unit | Unit type | Unit Sq Ft | Resident | Name | Market Rent | Actual Rent | Security Deposit | Resident Deposit | Other Deposits | Move In | Lease Expiration | Move out | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 11 | 0 | t0007174 | Lehzaveta Grynkovska | 0.00 | 2,665.00 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 02/28/2018 | | 0.00 |
| 02 | 11 | 0 | t0007175 | Gail Wilkins | 0.00 | 1,306.95 | 0.00 | 0.00 | 0.00 | 05/01/2017 | | | 0.00 |
| 03 | 11 | 0 | t0007176 | George Rogoff | 0.00 | 708.99 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 12/31/2017 | | 0.00 |
| 04 | 11 | 0 | t0007177 | Vashti DeVerteuil | 0.00 | 988.24 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 11/30/2017 | | 0.00 |
| 05 | 11 | 0 | t0007178 | Sandro Pettiot | 0.00 | 2,500.00 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 11/17/2017 | | -10,000.00 |
| 06 | 11 | 0 | t0007179 | Adrienne Margolis | 511.50 | 735.75 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 12/31/2017 | | 0.00 |
| 07 | 11 | 0 | VACANT | VACANT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 08 | 11 | 0 | t0007180 | Gary Gillian | 0.00 | 1,552.14 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 12/31/2017 | | 1,552.14 |
| 09 | 11 | 0 | t0007181 | Roseanne Norton | 0.00 | 1,178.00 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 12/31/2017 | | 0.00 |
| 10 | 11 | 0 | t0007182 | Kim Hoffman | 0.00 | 997.26 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 02/28/2019 | | 1,994.52 |
| 11 | 11 | 0 | VACANT | VACANT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 12 | 11 | 0 | t0007183 | Arlene Katz | 0.00 | 1,285.09 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 12/31/2018 | | 2,589.17 |
| 13 | 11 | 0 | t0007184 | Crystal Son | 0.00 | 1,346.82 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 12/31/2018 | | 0.00 |
| 14 | 11 | 0 | t0007185 | Geanoel O'Rourke | 0.00 | 3,200.00 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 11/30/2017 | | 6,400.00 |
| 15 | 11 | 0 | t0007186 | Nicole Bishop | 0.00 | 1,532.75 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 12/31/2018 | | 1,532.75 |
| 16 | 11 | 0 | t0007187 | Sarah Brown | 0.00 | 2,300.00 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 10/31/2017 | | 0.00 |
| 17 | 11 | 0 | t0007188 | Jason Chauvin | 0.00 | 1,248.55 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 03/31/2018 | | 12,485.50 |
| 18 | 11 | 0 | t0007189 | Thomas Collins | 0.00 | 3,200.00 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 10/31/2017 | | 1,920.00 |
| 19 | 11 | 0 | VACANT | VACANT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| 20 | 11 | 0 | t0007190 | Mara Barracca | 0.00 | 2,025.00 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 01/31/2018 | | 2,025.00 |
| E-STORE | store | 0 | t0007191 | The Green Garden Restaurant LLC | 0.00 | 8,000.00 | 0.00 | 0.00 | 0.00 | 05/01/2017 | | | 72,000.00 |
| W-STORE | store | 0 | t0007192 | Cityworks | 0.00 | 1,566.94 | 0.00 | 0.00 | 0.00 | 05/01/2017 | 12/31/2016 | | 9,401.64 |

| | Square Footage | Market Rent | Actual Rent | Security Deposit | Other Deposit | # of Units | Unit Occupancy | SqFt Occupancy | Balance |
|---|---|---|---|---|---|---|---|---|---|
| Current/Notice Res. | | | 38,337.48 | 0.00 | 0.00 | | | | 101,900.72 |
| Future Residents/Applicants | | | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| Occupied Units | 0 | 511.50 | | | | 19 | 86.36 | 0.00 | |
| Vacant Units | 0 | 0.00 | | | | 3 | 13.64 | 0.00 | |
| Totals: | 0 | 511.50 | 38,337.48 | 0.00 | 0.00 | 22 | 100.00 | 0.00 | 101,900.72 |

**EXHIBIT B-1**

**SECURITY DEPOSITS**

Apartment 1 - $2,665.00
Apartment 2 - $1,306.95
Apartment 3 - $708.99
Apartment 4 - $988.24
Apartment 5 - $2,500.00
Apartment 6 - $735.75
Apartment 8 - $1,552.14
Apartment 9 - $1,178.00
Apartment 10 - $997.26
Apartment 12 - $1,285.09
Apartment 13 - $1,346.82
Apartment 14 - $3,200.00
Apartment 15 - $1,532.75
Apartment 16 - $2,300.00
Apartment 17 - $1,248.55
Apartment 18 - $3,200.00
Apartment 20 - $4,050.00
Clayworks - Commercial Tenant #1 West Store - $1,566.94
The Green Garden Restaurant LLC - Commercial Tenant #2 East Store - $32,000.00

## EXHIBIT C

## SERVICE CONTRACTS

1.  The Metro Group, Inc.

## EXHIBIT D

## ADDITIONAL PERMITTED EXCEPTIONS

1. Agreement and Restriction recorded against the Property in CRFN 2017000064606, document dated September 21, 2016, recorded on February 15, 2017.
2. UCC-1 Financing Statement recorded against the Property in CRFN 2017000070355, document dated September 21, 2016, recorded on February 21, 2017.

**EXHIBIT E**

**EMPLOYEES AND COMPENSATION**

# EXHIBIT F

## BARGAIN AND SALE (WITHOUT COVENANTS) DEED

## EXHIBIT G

## ASSIGNMENT AND ASSUMPTION OF LEASES AND RENT ARREARS

**KNOW ALL MEN BY THESE PRESENTS** that E. 9TH ST. HOLDINGS LLC, a New York limited liability company, with its principal place of business c/o FIA Capital Partners LLC, 7280 West Palmetto Park Road, Suite 203-N, Boca Raton, Florida 33433 (the **"Assignor"**), in consideration of Ten ($10.00) Dollars and other good and valuable consideration in hand paid by _____ having offices at _____ (the **"Assignee"**), the receipt and sufficiency of which is hereby acknowledged, hereby assigns unto the Assignee all of Assignor's right, title and interest in and to the following:

All leases of any space at that certain premises located at and known as 332 East 9th Street, New York, New York, which are set forth on **Schedule A** attached hereto (the **"Leases"**).

**TO HAVE AND TO HOLD** the same unto the Assignee, its successors and assigns, from and after the date hereof subject to the terms, covenants, conditions and provisions contained in the Leases.

This assignment is made without warranty or representation, express or implied, by, or recourse against, the Assignor of any kind or nature whatsoever except as specifically provided in that certain Agreement dated as of June __, 2017 between 9TH ST. HOLDINGS LLC, as Seller, and _____, as purchaser.

The Assignee hereby assumes the performance of all of the terms, covenants and conditions of the Leases herein assigned by the Assignor to the Assignee from and after the date hereof and hereby agrees to perform all of the terms, covenants and conditions contained in the Leases from and after the date hereof all with the full force and effect as if Assignee had signed the Leases originally as the landlord named therein.

Assignee does hereby for itself and its legal representatives, successors and assigns agree to indemnify and save harmless Assignor and its legal representatives, successors and assigns, from and against any and all claims, costs, charges, expenses, losses and fees, including, but not limited to, reasonable attorneys' fees, incurred by Assignor, arising from or as a result of Assignee's acts or omissions, arising from and after the date hereof, asserted by any of said tenants or any person or persons claiming under any of them with respect to any such Leases.

Assignor does hereby for itself and its legal representatives, successors and assigns agree to indemnify and save harmless Assignee and its legal representatives, successors and assigns, from and against any and all claims, costs, charges, expenses, losses and fees, including, but not limited to, reasonable attorneys' fees, incurred by Assignee, arising from or as a result of Assignor's acts or omissions, arising prior to the date hereof, asserted by any of said tenants or any person or persons claiming under any of them with respect to any such Leases.

This agreement may be executed in counterparts, which counterparts, when taken together, shall constitute a single agreement.

**IN WITNESS WHEREOF**, the parties hereto have set their hands as of the ___ day of _____, 2017.

<div style="margin-left: 50%;">

**ASSIGNOR:**

**E. 9TH ST. HOLDINGS LLC**

By: _____
Name: David Goldwasser
Title:   Authorized Signatory

**ASSIGNEE:**

By: _____
Name:
Title:

</div>

Schedule A to Assignment and Assumption of Leases and Rent Arrears

(insert schedule of Leases)

# EXHIBIT H

## ASSIGNMENT OF SERVICE CONTRACTS

      **KNOW ALL MEN BY THESE PRESENTS** that E. 9TH ST. HOLDINGS LLC, a New York limited liability company, with its principal place of business c/o FIA Capital Partners LLC, 7280 West Palmetto Park Road, Suite 203-N, Boca Raton, Florida 33433 (the "**Assignor**"), in consideration of Ten ($10.00) Dollars and other good and valuable consideration in hand paid by _____ having offices at _____ (the "**Assignee**"), the receipt and sufficiency of which is hereby acknowledged, hereby assigns unto the Assignee all of Assignor's right, title and interest in and to the following:

      All of Assignor's interest in and to any and all warranties, permits, plans and specifications, intangible property, and the agreements listed on **Schedule A** attached hereto ("**Contract**"), to the extent such Contract is assignable.

      **TO HAVE AND TO HOLD** the same unto the Assignee, its successors and assigns, from and after the date hereof subject to the terms, covenants, conditions and provisions contained in the Contracts.

      This assignment is made without warranty or representation, express or implied, by, or recourse against, the Assignor of any kind or nature whatsoever except as specifically provided in that certain Agreement dated as of June ___, 2017 between E. 9TH ST. HOLDINGS LLC, as Seller, and _____, as purchaser.

      Assignee hereby assumes from and after the date hereof, any and all obligations of Assignor under the Contract and agrees to perform from and after the date hereof all of the terms, covenants, and conditions on the part of Assignor required therein to be performed.

      Assignee does hereby for itself and its legal representatives, successors and assigns agree to indemnify and save harmless Assignor and its legal representatives, successors and assigns, from and against any and all claims, costs, charges, expenses, losses and fees, including, but not limited to, reasonable attorneys' fees, incurred by Assignor, arising from or as a result of Assignee's acts or omissions, arising from and after the date hereof, asserted by any person or persons claiming under any of them with respect to any such Contract.

      Assignor does hereby for itself and its legal representatives, successors and assigns agree to indemnify and save harmless Assignee and its legal representatives, successors and assigns, from and against any and all claims, costs, charges, expenses, losses and fees, including, but not limited to, reasonable attorneys' fees, incurred by Assignee, arising from or as a result of Assignor's acts or omissions, arising prior to the date hereof, asserted by any person or persons claiming under any of them with respect to any such Contract.

      This agreement may be executed in counterparts, which counterparts, when taken together, shall constitute a single agreement.

IN WITNESS WHEREOF, the parties hereto have set their hands as of the ___ day of _____, 2017.

ASSIGNOR:

E. 9TH ST. HOLDINGS LLC

By: _____
Name: David Goldwasser
Title:  Authorized Signatory

ASSIGNEE:

By: _____
Name:
Title:

Schedule A to Assignment of Service Contracts

(insert schedule of Service Contracts)

## EXHIBIT I

## BILL OF SALE

In consideration of the sum of TEN ($10.00) DOLLARS, the receipt of which is hereby acknowledged, E. 9TH ST. HOLDINGS LLC, a New York limited liability company, with its principal place of business c/o FIA Capital Partners LLC, 7280 West Palmetto Park Road, Suite 203-N, Boca Raton, Florida 33433 ("**Seller**") does hereby sell, convey, grant and transfer to _____ ("**Buyer**"), without representation or warranty, all of Seller's right, title and interest in and to all personal property owned by Seller and used in connection with the ownership, management and/or operation of the premises described in **Schedule A** attached hereto.

[SIGNATURE PAGE TO FOLLOW]

**IN WITNESS WHEREOF**, Seller has executed this Bill of Sale as of the _____ day of _____, 2017.

**E. 9TH ST. HOLDINGS LLC**

By: _____
Name: David Goldwasser
Title:   Authorized Signatory

Schedule A to Bill of Sale

(Insert Description of Property)

## EXHIBIT B

E. 9th St. Holdings LLC - 332 East 9th Street, New York, NY

| | |
|---|---|
| Principal: | $ 5,693,783.52 |
| Accrued Interest: | $ 16,280.06 |
| Default Interest ($1,324.60/ day from and after 4/7/17-10/10/17) | $ 247,699.35 |
| Default Interest: ($1,324.60/ day from 10/11/17 – 11/14/17) | $ 46,361 |
| Late Fees: | $ 2,556.98 |
| Prepayment Fee: | $ 90,000 |
| Protective Advances: | $ 25,112.45 |
| Legal (through September 30, 2017)* | $ 47,619.04 |
| Less Adequate Protection Payments through 10/10/17: | $ (24,000) |
| **Total Due as of November 14, 2017:** | **$ 6,145,412.40** |

*subject to closing taking place on or before March 1, 2018, legal charges will be capped at $49,000